# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Younes Kabbaj,
     Plaintiff
v.
The City of New York, Manhattan DA's Office,
NY Criminal Court, Legal Aid Society, FBI, DHS,
US Marshals Service, Cyrus Vance, Samuel Levy,
Chikaelo Ibeabuchi, Desmond Egan, Timothy Wall,
Ryan Kennerson,Chris McClenic,Mike Kennedy,
Benjamin Dell, Tara Collins, David Kapner,
Edward Kerins, Mrs Miguel aka Susan Miguel
Mike Wakowski, John Does 1-9, Nubia Calderon
     Defendants

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

Case No. 15-cv-3627 (LTS) (RLE)

## _TABLE OF CONTENTS_

**The Federal Defendants (Pages 15-19)**:
Chris McClenic     ¶40-41, 44, 67, 69
Ryan Kennerson     ¶42-44, 53, 67, 69
John Does 8-9     ¶45-46
Mike Wakowski     ¶47-49
Mike Kennedy     ¶50
**The NYPD Defendants (Pages 20-25)**:
Timothy Wall     ¶51, 67
Desmond Egan     ¶51-59, 61-62, 64, 67, 69, 75
John Does 1-2     ¶55, 64, 67
John Does 3-4     ¶58-59
John Doe 5     ¶68
**The Prosecution Defendants (Pages 26-31)**:
Cyrus Vance     ¶63, 65, 67-76
Samuel Levy     ¶63, 67-76
Chikaelo Ibeabuchi     ¶66, 67-76
John Does 6-7     ¶68
**The Legal Aid Defendants (Pages 32-42)**:
Benjamin Dell     ¶77-89, 91-101
Collins/Kapner     ¶77, 92-101
**The NY Criminal Court Defendants (Pages 43-48)**:
Edward Kerins     ¶102-106
Mrs Miguel     ¶107-113
Jane Doe 10     ¶110-111

1

## FIRST AMENDED COMPLAINT AND JURY DEMAND

1.    Plaintiff seeks declaratory and injunctive relief, and damages resulting from an unlawful conspiracy by Defendants to stalk, harass, threaten, cyber-stalk, arrest, kidnap, rob, detain, maliciously prosecute and imprison Plaintiff on false criminal charges to punish him for his race/religion and national origin, all in violation of his civil rights.  201 Exhibits of evidence are attached to this complaint in an Appendix filed in the instant case as D.E. 54, each exhibit numbered from EX001 to EX201 (as will be referenced in this complaint by their EX number).

## THE PARTIES

2.    Younes Kabbaj is a citizen of Florida.

3.    Mark Simpson and Brian Albro are citizens of New York residing at 405 Main Street, Apt V, Manhattan NY 10044.  These two individuals are unable to officially be added to the Complaint at this time because the Delaware District Court has again claimed jurisdiction over them in a series of contradictory orders issued in Case No. 10-431-SLR-RGA-MPT.  The instant complaint will thereby be amended to add them as defendants, if and when clarification of this jurisdictional issue is resolved.

4.    The New York City Police Department ("NYPD") is an agency of the City of New York ("NYC") located at 1 Police Plaza, NY.  The New York County District Attorney's Office ("Manhattan DA") is an agency of NYC located at One Hogan Place, NY.  The New York County Criminal Court ("NY Criminal Court") is an agency of NYC located at 100 Centre Street, NY.

5.    The U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States federal government.  The Federal Bureau of Investigation ("FBI") and the United

States Marshals Service ("USMS") are federal law enforcement agencies within the U.S. Department of Justice. All three agencies are headquartered in the Washington DC area.

6. The Legal Aid Society ("Legal Aid") is a private organization headquartered in NY.

7. Desmond Egan ("Egan") and Timothy Wall ("Wall") are citizens of NYC and Detectives assigned to NYPD Midtown South Detective Squad, located 357 West 35 Street, NY.

8. Cyrus R. Vance ("Vance") is citizen of NYC and the elected New York County District Attorney. Samuel Levy ("Levy") and Chikaelo Ibeabuchi ("Ibeabuchi") are citizens of NYC and Assistant District Attorneys with the Manhattan DA's Office (under Cyrus Vance).

9. Mrs. Miguel aka Susan Miguel ("Miguel") and Jane Doe 10 aka Nubia Calderon are supervising Clerks with the NY Criminal Court. Edward Kerins is a Court Attorney.

10. Ryan Kennerson and Chris McClenic are Secret Service Agents with DHS. Mike Kennedy is a Special Agent with the FBI. Mike Wakowski is a Deputy with the USMS.

11. Benjamin Dell ("Dell") is a citizen of New York and attorney with the Legal Aid Society. Tara Collins ("Collins") and David Kapner ("Kapner") are supervising attorneys at The Legal Aid Society located at 49 Thomas Street, New York, NY.

12. John Does 1-2 are NYPD police officers present on September 26th, 2013 during the false arrest of Plaintiff. John Does 3-4 are NYPD police officers present at the jail where Plaintiff was transported after arrest. John Doe 5 is an NYPD officer present during a proffer held by the Manhattan District Attorney's Office on January 13th, 2014. John Does 6-7 are employees of the Manhattan DA's office present during same proffer. John Does 8-9 are Deputies with the USMS which intercepted and questioned Plaintiff prior to same proffer. Jane Doe 10 is a Clerk with the NY Criminal Court subsequently identified as Nubia Calderon.

13. Defendants FBI, DHS, USMS, Kennerson, McClenic, Kennedy, John Does 8-9 are hereby collectively defined as "Federal Defendants." Defendants Egan, Wall, John Does 1-5 are hereby collectively defined as the "NYPD Defendants." Defendants NYC, Manhattan D.A.'s Office, Vance, Levy, Ibeabuchi, John Does 6-7 are hereby collectively defined as the "Prosecution Defendants." Defendants NYC, NY Criminal Court, Kerins, Miguel, Jane Doe 10 are hereby collectively defined as the "NY Criminal Court Defendants." Defendants Legal Aid Society, Dell, Collins, Kapner are hereby defined collectively as "Legal Aid Defendants." Each category of Defendants are allotted their own section of the complaint (as described in Table of Contents, Page 1) to facilitate descriptions of the offense conduct as it relates to each group.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 42 USC §1983, Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) and 28 U.S.C. 1332 because the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs, and there is diversity of citizenship between Plaintiff and the Defendants. This Court also has supplemental jurisdiction over the claim for relief that arises under State law pursuant to 28 U.S.C. 1367(a) because it forms part of the same controversy and derives from a common nucleus of operative facts. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(3) because the Defendants are subject to personal jurisdiction in the District.

## BACKGROUND

15. In 2008, Plaintiff and Defendant Mark Simpson became employed together at a school located in Morocco called the American School of Tangier ("AST"). This school is run by high-level CIA and State Department officials and friends of Defendant Simpson. This

4

dispute was provoked when Defendant Simpson 'lost' and/or planted a USB key containing pornography at a lounge area inside the school, which was then found by another employee and submitted to the lost and found. Upon losing/planting the USB, Defendant Simpson then started to create an email trail attempting to link the lost USB as having been 'mistakenly' directed into Plaintiff's possession in a targeted attack (EX001). After this USB key was eventually (not immediately) transferred from the lost and found to Plaintiff's possession to determine its owner (as was the policy in the school even prior to Simpson's arrival), Plaintiff discovered that this USB key contained graphic homosexual and child pornography, and writings and documents belonging to both Simpson and his alleged boyfriend Brian Albro (which were also supportive of pedophilia and homosexuality).

**16.** Due to the fact that Plaintiff is a mandated reporter, he was obligated to report the 'loss' of this material (which could have been found by a student) to the Board of Directors for AST (which he did approximately January of 2009). Defendant Simpson thereby responded to the report by illegally terminating Plaintiff's employment and then publishing letters to thousands of the most influential people in Morocco falsely accusing Plaintiff of 'hacking' his USB key and other criminal activity (Appendix EX002). Defendant Simpson also recruited various pro-gay US government officials (including one former CIA director named Frank Wisner) on the Board of AST to thereby file false police complaints against Plaintiff directly with the King of Morocco (Appendix EX005). Defendant Simpson then fled Moroccan jurisdiction (Appendix EX004) where the malicious prosecution thereby remained ongoing until approximately December of 2009.

5

17.   Plaintiff filed suit in March of 2009 against Simpson and AST in Morocco for defamation and unlawful termination of his employment, and was awarded a judgment of approximately 150,000 Dirhams for those claims the following year.  The judgment was not appealed, and it stands as a final judgment on the matter (as it pertains to the events which occurred in Morocco).  Plaintiff also returned to America and filed suit against Simpson and AST in Delaware (as that is where AST is incorporated) as Case No. 10-cv-0431 SLR-RGA-MPT, District of Delaware (or the "10-431 case").  The 10-431 case remained ongoing from 2010 until a settlement agreement was reached in April of 2012 whereby AST paid out a total of $171,111.11 in damages to Plaintiff, and also issued him various letters of apology (Appendix EX006, EX010 to EX012).

18.   The current claims thereby commence approximately May 3rd, 2012 with the surprise breach of the settlement agreement by Defendant Simpson which was accompanied by the publication of hundreds of defamatory emails and blog articles authored by Defendants Simpson/Albro, once again falsely accusing Plaintiff of felony 'hate crime' hacking, stalking and threatening of them in violation of their civil rights (Appendix EX013, EX023), just as they had previously (and unsuccessfully) attempted in Morocco.  Defendants Simpson/Albro thereby continued their Moroccan conspiracy within the territorial boundaries of the United States and France where the defamatory and threatening materials are now confirmed to have been published from New York (where the last false police complaint was also filed).

## STATEMENT OF INSTANT CLAIMS

19.   Starting approximately May of 2012, Defendants Simpson/Albro thereby commenced a surprise, sneak-attack internet defamation campaign (in complete breach of a prior

6

settlement agreement), thereby assaulting Plaintiff over the internet (and elsewhere) with false accusations of hacking, terrorism and civil rights (ie 'anti-gay') offenses. Samples of the defamatory publications (including date/URL) are documented in the Appendix at EX002, EX003, EX005, EX013, EX016, EX018-021, EX023-043, EX045-098, EX102-110, EX112, EX114-144, EX146-188, EX195-197. The 'Summary of Exhibits' section of the Appendix (D.E. 54) describes the specific defamatory language in each publication that accuses Plaintiff of committing numerous felony crimes including terrorism, drug dealing, hacking, death threats, fraud, forgery, child molestation, stalking, invasion of privacy, etc. These allegations are known to Defendants Simpson/Albro to be false (as consistently demonstrated by their evasive actions).

**20.** Plaintiff therefore filed suit against Simpson/Albro for defamation and breach of the previous settlement contract in District of Delaware as Case No. 12-1322-RGA (which was later dismissed for lack of jurisdiction in Delaware because the publications were being made from New York, and where the Court determined that Plaintiff could only sue the signatory to the contract for its breach because Simpson did not sign it directly (as Ambassador Gabriel signed it on behalf of all the Named Defendants including Mark Simpson, Stephen Eastman and over 40 other Board Members). Simpson/Albro thereby vowed to retaliate against Plaintiff for his lawsuit in Delaware by devising a scheme to get him arrested and convicted of a felony 'hate crime' using their friends in the NYPD, Manhattan DA's office and Legal Aid. Their criminal plan is described as follows:

**21.** Approximately April 6th, 2013, Defendants Simpson/Albro purchased a subscription to an internet anonymity service called Proxy Solutions LLC, which allows their users to mask their IP address for purposes of surfing the web anonymously.

22.    Approximately April 7th, 2013, Defendants Simpson/Albro conspired together to send, and did send Plaintiff an 'anonymous' email (Appendix EX099) using Proxy Solutions LLC as their IP address to mask their identity (Appendix EX145).  This email, herein referred to as the "April 7th email" thereby threatened to place Plaintiff in prison for life for unspecified crimes, and demanded the death of Plaintiff, and also threatened Plaintiff's mother (as the reference to the 'strip mall' at the end of the email was a reference to the fact that Plaintiff's mother had just accepted a job at a local strip mall).

23.    Several days after the April 7th threat email, Plaintiff's mother discovered a message left by 'supporters' of the Defendants on her car (which appears to be linked to a private investigator in Florida that was hired by Simpson/Albro at approximately that time).   In subsequent discovery obtained by Plaintiff from Proxy Solutions LLC, he discovered that the internet history of Simpson/Albro confirmed that they conducted internet research looking for private detectives in the town where Plaintiff's mother lived.   Upon information and belief, Defendants Simpson/Albro thereby learned the movements of Plaintiff's family.   Immediately prior to when the threats were being issued to Plaintiff's mom, a UPS Store owner (an individual named Juan) where Plaintiff had a post office box he used to receive his Court mail (1844 N Nob Hill Rd #222, Plantation FL 33322) was also approached by unidentified persons who displayed a type of unofficial looking 'detective badge' (that did not to him appear to be actual, authentic police badge), and this unidentified person started to ask questions about Plaintiff specifically while trying to obtain personal information about Plaintiff from the UPS store owner.

**24.** Approximately April 16th, 2013, Plaintiff responded directly to Simpson/Albro's continued threats with an email attempting to deter any further illegal stalking by the Defendants of Plaintiff's Mother (Appendix EX101).

**25.** Approximately April 20th, 2013, Simpson/Albro sent Plaintiff another email threat to Plaintiff alleging he has been placed on some homosexual 'hit list' (Appendix EX105).

**26.** Plaintiff reported these threats to the Delaware District Court and FBI on April 15th 2013 in Case No. 12-1322-RGA, D.E. 49, Exhibit 1, which Simpson/Albro responded in D.E. 50 of the same case whereby they stated on page 1 (foot note):

> "Ironically, while accusing defendants of making death threats (without one shred of evidence), plaintiff makes a not-so-veiled threat himself, stating that "Plaintiff only defers to the Courts and FBI because he must first exhaust all possible government remedies before resorting to more justified, direct and appropriate responses to criminal activity of this magnitude."

> And then on page 3 of the same pleading Simpson/Albro state:

> "Evidence of the delusional nature of plaintiff's accusations is found in the exhibit attached to the reply brief. In an email, an anonymous person or group invites plaintiff to "drop dead" and "go play in the highway." From this, plaintiff accuses them of making death threats. Any rational person would recognize the difference between wishing someone dead (passive) and threatening to kill someone (active)."

**27.** Plaintiff receives any message sent to him directly by Defendants Simpson/Albro (and not directly through their attorney and/or the Court), to be an automatic death threat based upon the substantial long-term history of stalking and violent aggression they have visited upon Plaintiff since Morocco.  The history of Plaintiff's dispute with the Defendants started in 1987 when one of Defendant Simpson's friends named Joseph McPhillips attempted to molest Plaintiff in 1987 when he was only 12 years old.  McPhillips was thereby assassinated by

Plaintiff and the Moroccan Government in 2007 after he previously triggered 2 decades of US government stalking upon Plaintiff, and the death of McPhillips was supposed to signal a secret 'peace treaty' between US and Morrocan authorities concerning this matter. The Defendants instead collapsed back into the plotting against Plaintiff as documented in the events which took place in Morocco from 2008 until 2011 (and beyond).

28.    Due to this violent history, Plaintiff receives any attempt by Defendants to display knowledge of his mother's movements (derived from getting unknown persons and/or paid private investigators to stalk her), to be an extreme threat and provocation of the highest order. Any death threats also sent directly to Plaintiff are taken extremely seriously as is evidenced by Plaintiff's reaction to this clear and obvious long-term mafia dispute. Furthermore, Plaintiff (and the harassment law in New York) makes no distinction as to whether an 'anonymous' death threat should be 'active' rather than 'passive' in nature in order to be considered illegal.

29.    Plaintiff affirms that Defendants Simpson/Albro and their constituency are absolutely capable of brutal violence, and thus he never could even think of consenting to receive communications from them, especially after how they attempted to murder Plaintiff in Morocco through a complex and sophisticated attack, and where the Defendants provoked this dispute starting back in 1987 with the attempted molestation of Plaintiff at 12 years old and subsequent two decades of illegal stalking activity designed to scare Plaintiff into silence regarding what he witnessed as a child. Any such threatening communication sent by Simpson/Albro directly to Plaintiff (as documented in the April 7th email threat) is illegal and Plaintiff receives every provocation by the Defendants to be evidence of a pervasive, persistent, extreme and ever-

10

present threat of violent sabotage and murder attempts being plotted against him by these so called 'harmless' homosexual-atheist-extremists.

**30.** Thus it is clear from the above filing made by Simpson/Albro in Delaware on April 17th, 2013, that they were both fully aware that Plaintiff <u>received</u> the death threat they sent him on April 7th, 2013 after Plaintiff submitted it to the Delaware Court (as part of another email forwarded to Defendant Kennerson of the FBI, thereby making it a federal offense for Plaintiff to file this complaint with the FBI if he was fabricating it).  It is also clear that Simpson/Albro purchased a subscription service to a proxy company because they absolutely intended to commit a crime by later denying that they sent the email, and this anonymizer technology purchased by them was a key facet of their plan upon which the entirety of it depended thereby displaying the utter amateur nature of their sordid plot, as the only reason it failed is because they accidently chose one of the only proxy companies out of thousands and thousands that actually do retain records for a short time just to prevent potential abuse, or else they would have absolutely succeeded with their plot if their mouse had clicked just one link above or below on the Google search results when they made their choice.

**31.** If these 'passive' death threats were legal, Simpson/Albro need not spend money on specialized technology to hide its source from Plaintiff, Courts, FBI, NYPD and the Manhattan DA's office.  The attempt by Simpson/Albro's Delaware Attorney to suggest that Plaintiff is himself 'delusional' because he cannot draw arbitrary boundaries to distinguish between 'passive' and 'active' death threats which are being illegally sent to Plaintiff by violent pedophiles (who previously stalked Plaintiff for 2 decades before he finally orchestrated the assassination of their government-protected leader, Joseph McPhillips (in 2007), only for them to

11

resurface with a new leader named Mark Simpson in 2008 who was been attempting to murder the Plaintiff in various ways ever since to 'avenge' the death of McPhillips.

32. Thus Simpson/Albro's Delaware Attorney is claiming that 'passive' death threats are legal *only if they originate with homosexuals*, because if Plaintiff had sent a 'passive' death threat to the Defendants it would not similarly be legal because Plaintiff is not homosexual.  And Defendant Simpson/Albro's attorney attempts to further articulate interpretation of law to make a distinction between 'passive' and 'active' death threats which are originating with a group of known rapists and pedophiles, thus such nonsensical distinctions obviously could never sustain a successful conviction of Plaintiff in New York (which is why tracing the April 7th 2013 threat was of such extreme importance for Plaintiff to have admitted into evidence at trial or else it was clear he would be wrongfully convicted, especially if the judge also prevented all other ancillary evidence of the dispute from being admitted to a jury).

33. Simpson/Albro thereby conspired to file a false police report as demonstrated by their filings in Delaware on April 17th, 2013 which make no mention of Plaintiff's April 16th, 2013 'threat' email, while at the very same time they are filing false police reports in New York with their personal friend, Defendant Cyrus Vance (and filing of criminal complaints is itself barred by the Delaware Settlement agreement because Simpson/Albro are not allowed to file any criminal/civil complaints against Plaintiff without prior permission from the Delaware Court). Defendants Simpson/Albro also knew that they could only approach police/prosecutors that were friendly to even think about filing such a false police report because they needed to ensure that the police/prosecutors did not themselves attempt to trace the illegal death threats they sent to Plaintiff to deliberately incite and entrap him into their law enforcement web of 'gay allies.'

**34.**  This thereby comprised the 'master plan' devised by Defendants Simpson/Albro and their co-conspirators to arrest, kidnap, rob, injure, imprison and falsely convict Plaintiff of a crime as part of a scheme to prevail in civil litigation.  Defendants Simpson/Albro then instituted their plan by contacting Defendants Timothy Wall and Desmond Egan of the NYPD on April 16th, 2013 to file a false police complaint against Plaintiff (Appendix EX111) while specifically withholding disclosure of the fact that they sent Plaintiff an 'untraceable' illegal death threat to provoke him.

**35.**  Plaintiff was falsely arrested on September 26th, 2015, kidnapped and injured while in NYPD custody, subjected to unlawful invasion of his computer and cell phone whereby NYPD also illegally copied all of Plaintiff's most personal and private files under the guise of a 'law enforcement investigation' which was merely a direct robbery/hacking and theft of Plaintiffs digital properties (and deletion/destruction of his personal recordings).

**36.**  Plaintiff was then maliciously prosecuted for over a year and a half <u>while the cyber-stalking activity by Defendants Simpson/Albro remained ongoing throughout the entire falsified prosecution (and beyond).</u>  Protection for this illegal operation run by Defendants Simpson/Albro and their constituency was extended to them by the NYPD and Manhattan DA office who thereby supported Simpsons continued defamatory blog activities with government 'approval' for them while they also attempted to impose a felony conviction upon Plaintiff for 'hate crime.'

**37.**  This continued defamation/prosecution campaign was also thereby simultaneously protected by the Delaware District Court which was quashing every single subpoena served by Plaintiff attempting to trace the origin of the death threats that incited him into a falsified

attempted felony prosecution (despite the fact that the criminal prosecution was clearly initiated for the specific purpose of sabotaging Plaintiff's civil claims in Delaware).

**38.** In addition to the injuries he sustained during the false arrest, Plaintiff was also forced by yet another pro-gay NY Criminal Court Judge Lorrie Peterson (a former supervising attorney at Defendant Legal Aid Society) to travel from Florida to NY (at great expense and discomfort) to attend Court dates on 09/27/2013, 12/02/2013, 01/13/2014, 03/25/2014, 04/21/2014, 05/12/2014, 06/30/2014, 09/17/2014, 10/30/2014, 01/08/2015, 02/09/2015 or else risk a warrant to be issued (all but two dates were waived). Judge Peterson was aware as early as May 1st, 2014 (the date of the earliest Verizon subpoena response providing the exculpatory evidence which was withheld from Plaintiff for nearly 2 years), that the death threats sent to Plaintiff to incite him were successfully traced to Simpson/Albro's doorstep (and thus no conviction possible), yet still she refused to allow Plaintiff access to the exculpatory evidence and refused to grant Plaintiff's motion to defend himself for over 5 months after it was first filed.

**39.** The financial expenses incurred by Plaintiff as a result of this last false arrest (including travel and hotel expenses in New York, and medical expenses from his injury), have exceeded $50,000 by the time the prosecution was dismissed on February 9th, 2015, and such expenses are continuing to accrue as Plaintiff merely attempts to gather the remaining items of evidence that exonerated him of the charges before he leaves the Country to try and obtain safe-haven elsewhere in the hopes he may at least terminate the violent threats being made against him by the Defendants so that he can instead focus more on whatever non-violent methods are still available to obtain full restraint.

14

## THE FEDERAL DEFENDANTS

**40.**   Approximately 2009 the CIA, FBI and State Department all initiated an 'investigation' into the crimes being committed against Plaintiff by Defendants Simpson/Albro after they filed a false federal criminal complaint against Plaintiff in Morocco.  Since that time, the Federal Defendants have only ever investigated Plaintiff (clearing him of wrongdoing once prior as described in Appendix EX006), yet they also refused to investigate the Defendants to address the specific crimes being engaging against Plaintiff and thereby restrain this unlawful activity of constant threats, stalking, harassment, defamation and filing of false police reports.

**41.**   After repeated requests for a federal investigation of these crimes, Plaintiff was thereby contacted by Defendant McClenic approximately June of 2011 who thereby offered to investigate the Defendants whereupon he learned Simpson/Albro were stalking Plaintiff because of bias against him regarding his race/religion (as directly admitted by the Defendants in their various publications).   Defendant McClenic took the complaint and disappeared, and this provoked Plaintiff to thereby file a federal case against the NYPD defendants and all other Federal Defendants as Case No. 11-23492-MGC (Southern District of Florida, the "11-23492 case").  The 11-23492 case provides substantial background to the instant claims against all Defendants by fully documenting all prior State and Federal government involvement in this matter that continued to manifest as the instant claims.

**42.**   Approximately February of 2013 and immediately prior to Plaintiff's trip to the Middle East to engage defensive procedures concerning this imminent threat being posed by the Defendants, Plaintiff was again contacted by Defendant Kennerson (an alleged associate of McClenic), who was again claiming to be willing to investigate the crimes being committed

15

against Plaintiff by Simpson/Albro and their constituency.  Shortly after contacting the Plaintiff, Defendant Kennerson disappeared and again refused to arrest them, <u>even as the threats against Plaintiff and his family remained ongoing</u>.

43.  Again the Defendants started sending more death threats to Plaintiff the following month in April of 2013, and Plaintiff responded to Defendants Simpson/Albro directly and also by specifically cc'ing Defendant Kennerson (based upon his apparently false claim that he was investigating this dispute).  No response from Defendant Kennerson, yet NYPD Defendant Egan instead responded and claimed to be willing to investigate.  Upon information and belief, Defendant Egan contacted Defendant Kennerson and the result of this contact was a false arrest of Plaintiff shortly thereafter.

44.  After Plaintiff was again ambushed with another false arrest by Defendant Egan in September of 2013, and Plaintiff again reached out to Defendants Kennerson/McLenic in numerous emails yet they refused to respond from 2013 until present whereby Plaintiff emailed them dozens of times regarding every single detail/development of the malicious criminal prosecution engaged by Defendant Egan and Simpson/Albro's Manhattan DA crew.  All federal defendants refused to respond despite prior claims that they are the law enforcement entity which retains jurisdiction over this 'investigation' (which clearly overrides that which could be asserted by State Authorities).  Upon information and belief, these omissions were engaged by the Federal Defendants to help facilitate the ongoing malicious prosecution by the State Defendants in violation of Plaintiff's civil rights.  Thus the refusal by Federal Defendants to investigate these open crimes engaged by Simpson/Albro starting since Morocco and continuing to America, thereby constitutes a valid conspiracy between both Federal and State Defendants to subject the

Plaintiff to a falsified State arrest, kidnapping, robbery, injury and malicious prosecution commencing on September 26th, 2013.

45.   After the false arrest and malicious prosecution commenced in New York at the behest of the Federal/State Defendants, Plaintiff travelled from Florida to New York Criminal Court on January 13th, 2014 to attend a court date and a proffer requested by the Prosecution Defendants, and he was thereby intercepted in the courtroom by Federal John Does 8-9 before the scheduled proffer could occur.  Plaintiff was then taken to an alternative interview room somewhere in the Court to be 'pre-interviewed' by Federal authorities prior to the proffer session with State Authorities.

46.   John Does 8-9 identified themselves as Deputies with the US Marshal's service that were dispatched all the way from Delaware by Judge Richard G. Andrews (who was additionally assisting Simpson/Albro by obstructing Plaintiff's attempts to trace their death threats through the civil litigation which was long ongoing in Delaware since 2010, 3 years prior to Plaintiff's arrest in NY in 2013).  Plaintiff informed John Does 8-9 that he was being illegally prosecuted in New York after Simpson/Albro committed crimes against him by threatening him and his family. John Does 8-9 claimed that they are willing to investigate these threats (just like Federal Defendants McClenic/Kennerson before them), and requested contact information for Plaintiff's family so that they can also be interviewed regarding these threats, whereupon Plaintiff gave the phone numbers of his family.  Immediately thereafter, they again disappeared and refused to contact Plaintiff and/or his family to confirm that Simpson/Albro are sending them threats.

47.   Plaintiff also attempted to file civil suit against Simpson/Albro both in Southern District of Florida ("SDFL") as Case No. 14-60889-JAL (which was dismissed back to Delaware

17

jurisdiction), and again in January 2015 as Case No. 15-20160-DPG (after Delaware again purported to 'release' it back). This last case was thereby assigned to an openly homosexual judge named Darren P. Gayles. Shortly after the Plaintiff filed this lawsuit, Judge Gayles thereby also invoked Defendant USMS to once again get involved in this matter just (as Judge Andrews did previously when he dispatched John Does 8-9 to intercept Plaintiff at the NYC Criminal Court). Instead of once again sending the USMS to pretend to investigate this case (as had occurred previously on January 13th, 2014), Judge Gayles instead subsequently informed the Marshal's service to harass Plaintiff anytime he returned to the Court to hand deliver his pleadings to the Clerk for filing.

48. After filing suit against Simpson/Albro in Florida, when Plaintiff returned to the Court to hand-deliver additional pleadings, he was surprised with notification from the security at the Court house that the USMS had placed some sort of notation in the computer that stated Plaintiff would have to be escorted to the Clerk's office anytime he wished to file a pleading. When Plaintiff demanded that the Court staff inform him who specifically placed these directions into the Courthouse computer system and why, the Court staff informed the Plaintiff that the person who made these notations in the system was Defendant Mike Wakowski, who is a Deputy with the USMS. They also provided Plaintiff a phone number for Defendant Wakowski. Plaintiff immediately contacted him to inquire as to why he placed this notation in the computer system. Defendant Wakowski then informed Plaintiff over the telephone that he would further investigate the matter and call Plaintiff back.

49. Defendant Wakowski never called Plaintiff back, just like all previous Federal Defendants who also claimed to be 'investigating' yet were lying. After Plaintiff kept

complaining to the Court staff concerning this illegal action by Judge Gayles and Defendant Wakowski, the notation in the Court computer system was finally removed as when Plaintiff returned to the Court house on April 24th, 2015 to file a notice of appeal concerning dismissal of Case No. 15-20160-DPG, he was no longer required to be escorted to the clerk.

**50.**   In early March, 2015, Plaintiff thereby attempted a final contact with the Justice Department seeking to speak to a random FBI agent concerning these crimes by the Defendants. The Justice Department responded by sending Defendant Special Agent Mike Kennedy of the South Florida Joint Terrorism Task Force (FBI) to investigate the matter, whereby he contacted Plaintiff on March 30th, 2015 and engaged a 13 minute 48 second conversation concerning this long-term illegal conspiracy.  The summary of this conversation is that Defendant Kennedy was going to contact the Plaintiff a week later for further information, and again he also disappeared (just like the previous Federal Defendants).  Thus this 'investigation' by Federal Authorities has remained ongoing since approximately 1996 (as documented in SDFL Case No. 11-23492-MGC), while it is only resulting in the consistent arrest, kidnapping, injury, robbery, detainment, malicious prosecution of Plaintiff on false charges filed by Defendants Simpson/Albro over and over again, with protection for these activities being provided to them by every single organ of the United States government that exists for the specific purpose of restraining such activity through application of fact finding, law enforcement and final application of law and order.

**THE NYPD DEFENDANTS**

**51.** Approximately April of 2013, Defendants Timothy Wall and Desmond Egan thereby filed a criminal information against Plaintiff without first contacting him to investigate the matter. On 4/24/2013, Plaintiff was thereby contacted via email by Defendant Egan who stated "Mr. Kabbaj, Please call me. I would like to speak to you about Brian Albro. Thanks." At the time of this email, Defendant Egan already knew that Simpson/Albro's police complaint was false based upon the contents of Plaintiff's email which clearly indicate that Plaintiff is <u>responding</u> to threats sent to him by Simpson/Albro (and also cc'ing the FBI, which clearly indicates a lack of fear of arrest and thus demonstrates the mind frame of Plaintiff at the time he sent the email because a person clearly would not cc an FBI agent on an email like that if he was the aggressor).

**52.** In response to the initial email query from Defendant Egan, Plaintiff called him back on 4/29/2013 and engaged a 6 minute, 20 second telephone conversation whereby Defendant Egan claimed he was investigating the April 16th response email Plaintiff sent to Defendants Simpson/Albro. Plaintiff again specifically informed Defendant Egan that he was <u>responding</u> to Defendants Simpson/Albro after <u>receiving</u> illegal threats from them for years, at which point Defendant Egan declared that he would seek to make contact with Defendant Kennerson to obtain an update on the status of the investigation on the federal government's side. Since Plaintiff was in Florida and Defendant Egan was in New York, Plaintiff could not meet with him immediately to file an official police complaint against Simpson/Albro for their own threats to Plaintiff (as was suggested by Defendant Egan), so they made plans to meet next time Plaintiff was in New York.

20

**53.** Upon information and belief, Defendant Egan contacted Defendant Kennerson of the FBI/DHS (as he claimed he would do) to confirm that there was already a federal investigation that was ongoing concerning this exact dispute. The result of this communication was an unlawful arrest of Plaintiff by Defendant Egan, thus it is clear that the Federal Defendants encouraged the arrest to occur.

**54.** Between April and September of 2013, Plaintiff continued to trade numerous emails with Defendant Egan, whereby Defendant Egan continued to express a desire to investigate the overarching conspiracy and to also arrest Simpson/Albro for their death threats to Plaintiff. In an email sent to Plaintiff by Defendant Egan on 8/12/2013, Defendant Egan boasts an intention to arrest Simpson/Albro for their threats by writing "I would like nothing better than to arrest them (if the case has merit). They are located here in NY. Come here, let me interview you, then if the case has merit I will gladly arrest them. Let me know travel plans to NY. Thanks."

**55.** On September 26th, 2013, Plaintiff drove from Florida to New York to meet with Detective Egan at his precinct in Manhattan located at 357 West 35th Street. Plaintiff also brought with him copies of the death threats he was receiving from Simpson/Albro on a USB key which he provided to Defendant Egan upon the start of the interview. Defendant Egan left the interview room with the USB to review the threats Simpson/Albro sent to Plaintiff and other snippets of evidence, and he returned shortly thereafter and changed the interview topic to start questioning Plaintiff about his views on homosexuality. When Plaintiff asserted homosexuality to be a common psychological disorder like depression and/or bi-polar disorder and/or drug addiction, Defendant Egan thereby reacted violently to Plaintiff's opinion by arresting and falsely charging him with harassment of Simpson/Albro. Defendants John Doe 1-2 were present

to witness the false arrest and did nothing to intervene and stop Defendant Egan despite the fact that it was clear Plaintiff committed no crime <u>other than to merely state that he believed homosexuality was a psychological disorder after being specifically asked his opinion.</u>

**56.** After being falsely arrested by Defendant Egan, Plaintiff was led out of the interview room towards a finger-printing machine where he further attempted to explain to Defendant Egan that a healthy repulsion to feces and anal-sex can prevent psychological disorders like homosexuality, to which Defendant Egan made statements such as "you're not a psychologist - you're just a homophobe," and "there is nothing wrong with anal sex, you Muslims already know that." It was clear to Plaintiff from the moment of his arrest and the numerous bigoted statements made by Defendant Egan, that the entirety of the hostility he exhibited against Plaintiff was rooted in a difference of opinion concerning the origin of homosexuality (which is itself a philosophical/religious topic that cannot form the basis for a legal arrest).

**57.** Plaintiff was placed in a cell shortly after being fingerprinted and was allowed to use his cell-phone to contact his friends/family to inform them of the arrest. At that moment Plaintiff also began to record the remaining conversations between himself, Defendant Egan and John Does 1-2. When Plaintiff asked whether Simpson/Albro were also going to be arrested for their death threats to Plaintiff, Defendant Egan stated that they were not going to be arrested because they are 'justified to retaliate' against Plaintiff because of his 'homophobia' (despite the fact that the threats contained on the USB key clearly <u>preceded</u> Plaintiff's <u>response</u> and thus they could not be 'retaliatory' as described by Defendant Egan).

**58.** Defendant Egan thereby eventually confiscated Plaintiff's cell phone and the remainder of his property and informed Plaintiff that he was going to be transported to central

booking, at which point Plaintiff requested to use the bathroom before being transported. Defendant Egan refused and commanded Plaintiff to 'hold it in.' When Plaintiff finally arrived at central booking, he again asked Defendant Egan for toilet paper to use the bathroom and Defendant Egan responded by telling Plaintiff "use your clothes" and "it's just feces" to taunt Plaintiff concerning his prior statements affirming that a desire to engage anal sex is itself a psychological disorder.   Defendant Egan then gave instructions to John Does 3 and 4 at central booking to refuse Plaintiff access to toilet paper, which continued for another day before Plaintiff was finally released from custody by the Judge directly where he was then able to use a bathroom in the manner to which he is accustomed (by not being forced to use his own clothes to wipe after himself).

59.    Between the incarceration at the precinct and central booking (for a total of approximately 30 hours), Plaintiff was thereby refused access to toilet paper to use the bathroom despite his urgent need to do so.  Plaintiff had driven from Florida to New York and he did not use the bathroom prior to going to the precinct to meet Defendant Egan, whereby he was already in dire need to use the bathroom even before the arrest (and subsequent denial of access to use the facilities for another 30 hours).  Although Plaintiff could have used a toilet at central booking anyway despite the pain, he did not have anything he could use to wipe himself and thus he refused to use his clothes or bare hands simply because Defendant Egan sought to punish Plaintiff for having an opinion that repulsion to feces and/or anal sex is healthy.

60.    Even when Plaintiff finally used the bathroom after being released from police custody, he continued to feel pain that was increasing substantially (rather than decreasing). Within a day, the pain had reached such and extreme that Plaintiff was forced to go to a hospital.

23

Plaintiff would later confirm that his injury was manifested as an extremely painful thrombosis hemorrhoid which required significant surgery that was undertaken immediately upon Plaintiff's return to Florida from the New York arrest. The surgery to remove the inflamed thrombosis, generated over $33,493.69 in medical bills incurred from the false arrest and several nights stay in the hospital, along with extreme pain both before and after surgery.

61. This instant complaint is not the first one filed against Defendant Egan. In another federal civil Case No. 12-cv-3268-LAP (SDNY), Defendant Egan is accused of engaging similar actions against another arrest victim named James Smith who testified that Defendant Egan "seriously injured Defendant while using illegally excessive force in conducting that arrest, and thereafter for some 22 hours, engaged in deliberate indifference to plaintiff's serious medical needs by denying him medical treatment…" Defendant Egan is also named as a Defendant in Case No. 13-cv-8061-LAP (SDNY) whereby he was accused of engaging another illegal arrest and malicious prosecution of another victim named Trent Patterson, whereby the charges for were dismissed and a settlement agreement extended him by Defendant NYPD. It is unknown at this time how many other disciplinary infractions or complaints have been filed against Defendant Egan directly with his precinct and/or the civilian complaint review board.

62. It is also plainly visible in the arrest affidavit submitted by Defendant Egan to the Manhattan DA and the Courts (Appendix EX111) that Defendant Egan selectively quotes from emails sent by Plaintiff by specifically omitting all portions of the emails that confirm Plaintiff is himself <u>responding</u> to threats. Egan thereby only documents portions of the email where Plaintiff is calling the Defendants 'faggots' while specifically withholding <u>all content</u> contained

in that same email which proves Plaintiff is making those statements in response to death threats clearly sent by Simpson/Albro to Plaintiff and his mother to deliberately provoke the Plaintiff.

63.    After the arrest of Plaintiff on September 26th, 2013, Plaintiff was arraigned the following day upon which time the Manhattan DA's office (under the direction Defendant Cyrus Vance, who is a personal friend of Simpson as documented in EX143 of the Appendix) asked the Court to impose several thousand dollars bail upon Plaintiff so he could remain in police custody where they intended to deny him access to use a bathroom indefinitely (which could have resulted in Plaintiff's death).  The Arraignment Court Judge unknowingly saved Plaintiff's life by releasing him on his own recognizance whereby Plaintiff immediately went to use a bathroom before returning to Defendant Egan's precinct to collect his property, or else he could have been very seriously harmed if his detention had been continued.

64.    Upon return to Defendant Egan's precinct, he was not there and Plaintiff thereby argued with an unidentified officer who refused to return Plaintiff's property, at which time Plaintiff refused to leave without it and it was eventually provided to him.  After Plaintiff left the precinct and checked his cell phone and recording device, he discovered that recordings of the arrest were deleted by Defendant Egan and John Does 1-2.  The USB key that Plaintiff provided to Defendant Egan (containing the threats received from Simpson/Albro) was also missing from his property.  Upon information and belief, Defendant Egan also illegally accessed Plaintiff's personal computer and all his other personal and private files also contained on the computer).  Defendant Egan and John Does 1-2 thereby pilfered and copied Plaintiff's files in a further robbery of Plaintiff before they returned his computer to him after being released.

25

## THE PROSECUTION DEFENDANTS

**65.** Shortly after Plaintiff's false arrest, Defendant Vance assigned the case to be maliciously prosecuted by Assistant District Attorneys Samuel Levy and Chikaelo Ibeabuchi. Defendant Levy is yet another direct friend of Mark Simpson (who was an English teacher to both Defendant Levy's and Defendant Vance's children). This is documented in a February 10th, 2014 email sent by Simpson/Albro to Ambassador Edward M. Gabriel (former US Ambassador to Morocco), where Simpson specifically states (in EX143 of the Appendix):

> "I am working with ADA Sam Levy in New York, and we will soon be appearing before the Grand Jury. Because (as I have told the D.A., whose children I taught as Trinity, and ADA Mr. Levy)"

**66.** Defendant Ibeabuchi also once received an award from another friend of Mark Simpson (former presidential candidate Al Gore), thus it is clear that Simpson/Albro and the Manhattan DA office are all friends because they are part of the same small political circle.

**67.** Approximately January of 2014, Plaintiff was informed by the Public Defender assigned to his case, Defendant Benjamin Dell, that Defendants NYC, Manhattan DA Office, McClenic, Kennerson, Wall, Egan, Vance, Levy, Ibeabuchi, John Does 1-2 were all now maliciously denying knowledge of the existence of the illegal April 7th threat email sent by Simpson/Albro to incite Plaintiff. Defendant Dell also informed Plaintiff that Defendant Egan was also falsely claiming that he never searched the USB key Plaintiff provided him before the arrest. Defendants Levy/Ibeabuchi were now requesting Plaintiff provide them permission to search this USB key, and they were also requesting Plaintiff to participate in a proffer session at the Manhattan DA's Office on January 13th, 2014 to further 'investigate' the dispute. Plaintiff

26

thereby provided Defendants Levy/Ibeabuchi consent to search the USB key through his attorney Defendant Dell on January 9th, 2014, and also consented to the proffer on January 13th, 2014.

68. Following a surprise secret interview by Defendants John Doe 8-9 on the morning of the January 13th, 2014 proffer at the NY Criminal Courthouse (as documented in Paragraphs 38-40 of this complaint), Plaintiff thereby proceeded to his scheduled 'investigative' proffer session with Defendant Dell and Defendants Levy, Ibeabuchi, John Doe 5-7 at the Manhattan DA's office where again they were purporting to be willing to investigate the various criminal activities of Simpson/Albro and their constituency at AST.  The facts of the dispute (going all the way back to Morocco) were again discussed and the Manhattan DA and NYPD defendants made it clear that the investigation would continue based upon the relevant information and leads provided by Plaintiff.  Immediately after this proffer session on January 13th, 2014, Defendants Levy/Ibeabuchi instead switched gears and instead informed Defendant Dell that Simpson/Albro were denying sending any threats to Plaintiff and that they were instead seeking to convene a grand jury to upgrade charges against Plaintiff to a felony 'hate crime.'

69. After termination of his Court Appointed attorneys in April of 2014, Plaintiff thereby began to communicate directly with Defendants McClenic, Kennerson, Egan, Vance, Ibeabuchi, Levy via numerous emails, telephone calls for almost a year whereby Plaintiff continuously informed them that a preliminary trace of the April 7th, 2013 death threat thereby confirmed it was sent by Defendants Simpson/Albro using Albro's PayPal account, and that Proxy Solutions LLC further disclosed the actual IP address in New York where the threat originated (Appendix EX145).  From that point for the Prosecution Defendants refused to engage any further trace of the April 7th threat email and still attempted to upgrade charges to Felony.  All Defendants

refused to restrain Defendants Simpson/Albor and/or otherwise act to terminate the clearly falsified criminal complaint filed by them.

70.  During a Criminal Court date attended by Plaintiff on May 12th, 2014, Defendant Albro himself appeared at the NY Criminal Court to further stalk and harass the Plaintiff and attempt to provoke a physical fight inside of the Courtroom.  Defendant Albro thereby spent the entire day in the Court room, mouthing obscenities at flipping Plaintiff the middle finger while being openly protected to engage this activity by Defendants Levy/Ibeabuchi (who refused to instruct him to leave the Courtroom).  When Plaintiff complained to the Judge about what Defendant Albro was doing, he fled the Courtroom.  This is captured in the transcripts of that hearing.  It is assumed that the Defendants were deliberately attempting to provoke a physical fight inside the Courthouse, and in the hopes it would somehow better enhance their collapsing criminal case and/or result in alternative criminal charges which could be substituted for the failing instant charge that was being attempted for prosecution.  Plaintiff did not fall for their additional entrapment plots and remained calm all throughout these extreme provocations.

71.  Approximately July of 2014, Plaintiff served a subpoena issued directly by the NY Criminal Court to Verizon to trace the April 7th threat.  Upon Verizon receiving the subpoena and contacting the account holder Defendant Brian Albro to inform him of the subpoena, upon information and belief Defendants Simpson/Albro thereby notified the Prosecution Defendants that Plaintiff had issued yet another subpoena again attempting to trace the death threat email. The Prosecution Defendants thereby contacted Verizon directly sometime in July of 2014 and informed them not to respond to the subpoena because Plaintiff was "directed to undergo a psych eval" before he could represent himself and thus his subpoena (which was actually issued

directly by the Criminal Court Judge) was somehow 'invalid.'  This statement by the Prosecution Defendants was completely false as Plaintiff was never ordered to undergo any psychiatric evaluation because the Manhattan DA and Legal Aid Defendants specifically <u>refused</u> to conduct one after first demanding it.  Verizon thereby also refused to accept these false claims as valid and instead responded to the subpoena by sending the response to the Court directly (where it was then withheld from Plaintiff by the Court Attorney and Court Clerk as will described later in this complaint).  Plaintiff sent a copy of this Verizon conversation to Judge Swain/Ellis in an Audio CD attached to D.E. 28.

**72.**  It is already established by the Courts that to file a successful suit for damages against a Prosecutor, one cannot sue for actions taken as part of his prosecutorial duties but rather for actions undertaken as part of his investigative duties.  In Yarris v. County of Delaware, 465 F.3d 129 (3d Cir.) the Courts held that prosecutors cannot claim a 'duty' to destroy evidence, and thus the attempts by the Prosecution Defendants to compel Verizon not to respond to a valid subpoena issued directly by the Courts (with the hopes that the subpoenaed information will eventually become unavailable), is tantamount to deliberate destruction of evidence and thus cannot be considered an action within the scope of any prosecutors job duties.

**73.**  In Genzler v. Longanbach, 410 F.3d 630 (9th Cir. 2005), the Court found that when a Prosecutor attempts to question witnesses directly, such activity is investigative in nature because questioning of witnesses is typically a function conducted by the police and not the prosecutors.  In this case, the Prosecutors were armed with knowledge of criminal activity being committed by numerous officials at AST (as documented by Defendants Simpson/Albro in Appendix EX023), yet instead of requesting the NYPD investigate these matters directly, the

29

Manhattan DA Defendants instead started contacting the witnesses directly (including Ambassador Gabriel) to threaten them with criminal prosecution if any of them attempted to assist Plaintiff in both his civil/criminal defense. These investigative maneuvers by the Prosecution Defendants are outside the scope prosecutorial duties thus qualified immunity cannot apply regarding their refusal to question witnesses when it will uncover criminal wrongdoing by Defendant Simpson and his direct associates (including Ambassador Gabriel), and additional threats to question other witnesses as part of their attempts to intimidate them to prevent them from testifying on Plaintiff's behalf during the upcoming trial.

**74.** On November 9th, 2014 while prosecution was still pending, Plaintiff again received two direct internet communications originating with Simpson/Albro, one of which came from an email account attempting to impersonate Judge Joan A. Lenard from Case No. 14-60889-JAL (SDFL) previously filed against Simpson/Albro in Florida. The emails are as follows:

A) Date: 11/09/2014  Time: 07:51PM
From: leonardj@hotmail.com (IP Address 69.201.183.45)
Message: "What are you, some crazy nut? Why are you treating this
horrible website seriously?"

B) Date: 11/09/2014  Time: 07:49PM
From: unclewaltham@yahoo.com (IP Address 69.201.183.45)
Message: "I know absolutely no one named Waltham and find this
website to be sick, wrong, hurtful and destruction. Why write
such things as this? It's all a sham. No one is looking for me.
They're looking for you. What a creepy website. And as for
Waltham, he can …"

**75.** The two communications cited in preceding paragraph were sent directly to the Plaintiff from a Time Warner Inc. New York City-based IP Address and the content of the communications clearly purport to be authored by Defendant Simpson, who is speaking in the first person while responding to a then-recent court filing made by the Plaintiff on October 30th,

2014 in 2nd Circuit Court of Appeals (concerning a blog associate of Simpson's named Simon Waltham).  These illegal, unwanted and unsolicited threatening communications continued to be sent to Plaintiff by Defendants Simpson/Albro even as the criminal prosecution was still pending, and where Simpson/Albro are again claiming that unidentified persons are 'looking' for Plaintiff (with the obvious implication that they seek to harm him).  Plaintiff again submitted these threats to Defendants Egan/Vance/Levy/Ibeabuchi and they refused to arrest Simpson/Albro for their continued threats even as a criminal procedure instituted by Defendants Simpson/Albro for 'harassment' and 'hate crimes' remained pending.  During the next court date when Plaintiff asked Defendant Ibeabuchi to explain to the Criminal Court why these threats are continuing, Defendant Ibeabuchi stated that the threats were 'under investigation' without explaining why Defendants Simpson/Albro were not being arrested for them.

**76.**  On February 9th, 2015, the Defendants Vance/Levy/Ibeabuchi finally dismissed the false complaint filed against Plaintiff on the eve of trial (Appendix EX201).  In the interim, the purpose of the malicious prosecution (as supported by all Defendants) was to terrorize Plaintiff with the threat of years in prison for approximately 700 days straight, from the date of the false arrest in September 2013 until the date when the case was finally dismissed in February of 2015. This torture was engaged against Plaintiff specifically because he holds an opinion that homosexuality is a psychological disorder (which is an opinion he is entitled to have without being arrested and imprisoned).  It is also clear that the Defendants will never cease their crimes against Plaintiff and they are already plotting the next malicious arrest/prosecution at this time.

## THE LEGAL AID DEFENDANTS

**77.**   At all relevant times herein, Defendant Dell was under the direct supervision of Defendants Tara Collins and David Kapner who were also involved with Plaintiff's defense. Defendants Collins/Kapner were thereby intimately involved in every aspect of Plaintiff's defense and were responsible for all litigation strategy conceived and/or employed by Dell.

**78.**   After Plaintiff's arrest, he was assigned Defendants Legal Aid Society as his Court-appointed attorneys.  Plaintiff first met Defendant Dell on September 27th, 2013, during his arraignment.   Defendant Dell immediately interrogated Plaintiff about his stance on homosexuality whereby Plaintiff again repeated his informed intellectual opinion that homosexuality is a psychological disorder.  Defendant Dell then asked Plaintiff if he would accept the assignment of a homosexual attorney to assist with his defense by intimating that he was himself homosexual, whereby Plaintiff informed him that he would not deny representation from an attorney solely because they suffer from a treatable psychological disorder if it didn't affect their ability to provide effective assistance with NY criminal law.

**79.**   Starting on September 27th, 2013, Defendant Dell expressed a complete understanding of the strategy necessary to mount a defense to the charges, and he also asserted a clear need to trace/confirm that Defendants Simpson/Albro were the source of the originating emails threats.   After reaching this understanding, Defendant Dell then acted in a manner contrary to this understanding by sabotaging Plaintiff's defense to punish him for holding an opinion that homosexuality is a psychological disorder.

**80.** Plaintiff didn't terminate Defendant Dell's representation solely because he intimated he was homosexual, which was a mistake that nearly cost him his life.  The archive of

32

communications between them comprises approximately 320 emails and 90 calls/messages starting approximately 9/29/13 with dates/times of at least 20 relevant telephone calls as follows:

| Date | Time | Duration | Date | Time | Duration |
|------|------|----------|------|------|----------|
| 2013/10/14 | 04:26PM | 00:14:30 | 2014/01/23 | 07:30PM | 00:39:16 |
| 2013/10/14 | 04:46PM | 00:13:33 | 2014/01/29 | 04:41PM | 00:58:15 |
| 2013/11/25 | 04:18PM | 00:11:48 | 2014/01/29 | 05:21PM | 00:08:33 |
| 2013/12/04 | 02:36PM | 00:29:10 | 2014/01/30 | 03:08PM | 00:41:26 |
| 2014/01/06 | 06:08PM | 00:51:23 | 2014/02/05 | 06:31PM | 00:17:15 |
| 2014/01/06 | 06:14PM | 00:04:47 | 2014/03/20 | 12:21PM | 01:19:21 |
| 2014/01/09 | 05:50PM | 00:17:03 | 2014/04/04 | 04:34PM | 00:40:48 |
| 2014/01/16 | 03:11PM | 00:06:44 | 2014/04/07 | 03:45PM | 00:00:52 |
| 2014/01/16 | 04:56PM | 00:31:31 | 2014/04/14 | 02:13PM | 00:10:39 |
| 2014/01/23 | 06:50PM | 00:40:32 | 2014/05/01 | 08:24AM | 00:01:08 |

**81.**   In all telephone and email communications cited above, Defendant Dell refuses to trace the originating IP of the April 7th threat sent by Simpson/Albro to incite Plaintiff. Defendant Dell also consistently lies and claims to have retrieved evidence by sending subpoenas when he didn't.   Defendant Dell additionally sends out irrelevant subpoenas to retrieve other unnecessary evidence in order to give the appearance of a defense, and then also hides these additional subpoena responses from Plaintiff when they 'accidentally' uncover evidence harmful to Defendants Simpson/Albro.   Defendant Dell also admits to waiving Plaintiff's constitutional rights to a speedy trial against his will, and he accuses Plaintiff of suffering from a psychological disorder because he refuses to join the homosexual religion. Defendant Dell also attempts every possible action meant to assist the Prosecution and Federal Defendants to upgrade the charges against Plaintiff to Felony 'hate crime' by also trying to waive Plaintiff's right to testify at grand jury proceedings.

**82.**   Between September and December   of 2013, Plaintiff specifically instructed Defendant Dell not to waive the 90-day speedy trial clock based upon the clear intent of the

33

Defendants to prolong their malicious prosecution of Plaintiff for as long as is possible.  Plaintiff informed Defendant Dell that it is an extreme burden to travel 1300 miles every month to keep up court dates in NY (or risk arrest warrant issued).  Legal Aid Defendants still unlawfully waived Plaintiff's right to a speedy trial sometime between January 13th, 2013 and March 4th, 2014 despite Plaintiff's express instructions not to do so, thereby extending the malicious prosecution long after the 90 day deadline until dismissal in February of 2015, which could have mandated Plaintiff be allowed to have his trial no later than December of 2013.

**83.**  In a conversation on January 6th, 2014, Defendant Dell also stated that he sent out a subpoena to trace the April 7th email threat, which was false.  Defendant Dell also began to subpoena information which was not critical to Plaintiff's defense concerning various blog sites owned by Simpson, while specifically avoiding sending any valid subpoenas which could specifically result in a trace of the April 7th threat which was clearly the most important piece of evidence relevant to Plaintiff's defense because it was closest in temporal proximity to Plaintiff's response (for which he was being prosecuted).

**84.**  When Plaintiff demonstrated an ability to try and subpoena evidence on his own through the civil litigation without assistance from Defendant Dell (who was refusing to do so), Defendant Dell thereby engaged a false attempt to 'catch-up' by sending a deliberately flawed subpoena to Yahoo as part of a feigned effort to also trace the April 7th email threat.  Yahoo responded to Defendant Dell on January 28th, 2014 to inform him to correct the mistakes on the subpoena and resubmit it.  After Plaintiff reviewed the mistakes (which were clearly deliberate because Plaintiff previously gave him a template to replicate and instead Defendant Dell altered it to make it deficient), Plaintiff thereby corrected the subpoena for resubmission.  Defendant

Dell then received another response from Yahoo on February 19th 2014 which he deliberately withheld from Plaintiff because it further disclosed the existence of a link between the email account used to threaten Plaintiff and yet another yahoo account used to establish an online dating profile for Brian Albro at URL:   http://chat.alt.com/profile/Masterb983 (this profile is documented in Appendix EX191).

**85.**   The above dating profile is relevant because it establishes a link between Albro's dating accounts and the April 7th threat email, and it also demonstrates that Defendants Simpson/Albro make liberal use of the word 'faggot' in their own public sadomasochistic sex profiles that they openly publish on the internet (accompanied with nude photographs of their genitals where they are also soliciting persons to engage consumption of excrement with them as part of the sex act).

**86.**   The withholding of this Yahoo evidence by Defendant Dell is significant because Simpson/Albro and the Defendants were advocating 'hate crime' prosecution against Plaintiff because he consistently calls them 'faggots' in response to their highly provocative and extremely illegally stalking/threatening/harassment of Plaintiff, and it is thereby clear that Plaintiff interprets the term to define a homosexual that commits sexual-based crimes and/or illegal discrimination against heterosexuals.  It is also clear that Simpson/Albro are  knowingly and deliberately soliciting this language from Plaintiff by virtue of their constant stream of crimes they have been committing against Plaintiff for years.  The Defendants themselves make liberal use of the word 'faggot' in its actual discriminatory capacity by alleging that all homosexuals are essentially 'faggots' just by being homosexual, thus it is clear that they are not

offended in the least when Plaintiff calls them a 'faggot' because they keep requesting him to do it year after year as they continue to solicit this language by illegally stalking Plaintiff.

87.   When Plaintiff confronted Defendant Dell about his various acts of obstruction, Defendant Dell stated that he never received a response from Yahoo on February 19th, 2014 (even though Yahoo also provided a copy of an invoice for $40.46 paid to them by the Legal Aid Defendants for fees incurred during research conducted for that specific subpoena response). Plaintiff only became aware of this subpoena response accidentally while contacting Yahoo to inquire about a different subpoena served upon them through one of Plaintiff's civil cases. Plaintiff was thereby eventually able to retrieve a copy of this exculpatory email response to Defendant Dell from Yahoo directly, or else he never would have known it existed.

88.   Defendant Dell also sent a deliberately flawed subpoena to Verizon as part of his purported attempts to complete a trace of the NY IP Address used to send the April 7th email threat, and he again deliberately placed the wrong date/time of the email on the subpoena (just like he previously sent a deliberately flawed subpoena to Yahoo), which resulted in retrieval of the wrong identity information from Verizon.   When Plaintiff requested that he send another subpoena to Verizon with the accurate information to correct his consistent string of deliberate errors, Defendant Dell informed Plaintiff that he sent a corrected subpoena when he did not. Plaintiff confronted Defendant Dell about his failure to send a follow up subpoena to Verizon in telephone conversations/emails taking place from 1/16/2014 to 4/14/2014 and Defendant Dell consistently lied and claimed he sent out accurate subpoenas to Verizon, and he consistently blamed Verizon by claiming that the Verizon representatives handling the case were lying to Plaintiff by alleging they never received his subpoenas.

89. After Plaintiff kept persisting by contacting Verizon to confirm that Defendant Dell did not send them any corrected subpoena (whereby Plaintiff recorded the conversation with Verizon and provided it to Defendant Dell directly), Defendant Dell then blamed the malfunction on a 'broken' fax machine in his office (yet he still he refused to send a follow-up subpoena and continued to lie and claim that he did).  In the end, Verizon never received a valid subpoena directly from Defendant Dell during the entire duration of their representation of Plaintiff from September 27th, 2013 until April 21st, 2014 until Plaintiff himself went out to a local UPS Store to fax a copy of Defendant Dell's subpoena to Verizon himself in order to overcome this 'broken fax machine' that was preventing Defendant Dell from accomplishing it over a period of many months (while his fax machine seemed to work while retrieving other irrelevant evidence).

90. After Plaintiff was subjected to a complete obstruction of the trace of these threats by the Legal Aid Defendants, Plaintiff thereby also commenced to using subpoenas served through civil litigation in Delaware to attempt to trace the April 7th threat himself.  Upon serving subpoenas issued through Case No. 13-1522-RGA (District of Delaware), Plaintiff thereby received the first verified trace of the April 7th threat email from Proxy Solutions LLC on February 5th, 2014 (Appendix EX145), shortly after the Prosecutors announced an intention to upgrade the charges to a felony.  This notarized report is thus the first piece of exculpatory evidence to confirm that Simpson/Albro sent illegal death threats directly to Plaintiff to incite him as part of a deliberate plot to effectuate the false arrest/prosecution of Plaintiff.

91. When Plaintiff first shared this new exculpatory evidence from Proxy Solutions LLC with the Legal Aid Defendants approximately February 5th, 2014, at first Defendant Dell was ecstatic about the exculpatory evidence and agreed that that he would provide the Court and the

Prosecution Defendants immediately, but then Defendant Dell inexplicably changed his mind approximately a week later (without any valid explanation) and thereby refused to provide the evidence to anyone after switching gears to claim it must now be kept secret at all costs.

92.   Defendants Dell/Collins/Kapner thereby informed Plaintiff starting approximately February 5th, 2014 and continuing until April 21st, 2014, that their intended 'legal' strategy for Plaintiff's defense was to instead allow the Prosecution Defendants to obtain an uncontested upgrade of the false charges to a felony 'hate crime' in order to keep this exculpatory evidence secret for purposes of 'surprising' Simpson/Albro with it at trial.  Such a strategy is not plausible in light of the fact that the Prosecution Defendants were only claiming to be intending to upgrade the charges to a felony based upon their belief that a trace of these threat emails will prove that they <u>did not</u> originate with Simpson/Albro.

93.   In telephone conversations between Plaintiff and Defendant Dell from February 5th until April 2014, Plaintiff thereby refused to consent to keep exculpatory evidence secret as requested by the Legal Aid Defendants, and consistently demanded that this evidence be disclosed to the Prosecution Defendants and the Court to prevent any attempted upgrade of charges to a felony (and to further justify the additional subpoenas which still needed to be sent to Verizon to complete the trace).  The Legal Aid Defendants thereby refused to disclose this evidence to the Prosecutors and the Court, and instead called Plaintiff into a meeting at the Legal Aid Society in New York on March 25th, 2014 to discuss how to handle the disclosure (or rather suppression) of this exculpatory evidence.  During this meeting attended by Plaintiff and Defendants Dell/Collins/Kapner, the Legal Aid Defendants thereby demanded that they not only keep this evidence secret from the prosecutors, but that Plaintiff also waive his right to appear

38

and testify at grand jury proceedings so as to allow the prosecutors an uncontested upgrade of the false misdemeanor charges to false felony charges.

94.   During that same meeting on March 25th, 2014, Plaintiff refused to waive his right to appear at the grand jury and demanded to invoke his constitutional right to testify in order to directly dispute Simpson/Albro's denial of publication of the April 7th email threat.  The Legal Aid Defendants then threatened that they would make a false claim of psychological incompetence to the Court to prevent Plaintiff from providing testimony at the grand jury hearing so that he could be rendered incapable of preventing the falsified upgrade of charges to a Felony. The Legal Aid Defendants thereby falsely accused Plaintiff of suffering from a psychological disorder to obstruct Plaintiff from invoking his constitutional right to testify at grand jury hearing so as to ensure the unlawful upgrade of charges to felony 'hate' crime.

95.   The Legal Aid Defendants also attempted to force Plaintiff to sign a medical disclosure form on March 25th, 2014 so that they could unlawfully obtain his medical records (to which Plaintiff refused) as part of their efforts to impose a false psychiatric diagnosis upon Plaintiff alleging that he is unfit to participate in his own defense (based upon his lack of support for the homosexual religion).  Plaintiff does not suffer from any mental defect whatsoever, yet Simpson/Albro both suffer from serious psychological disorders and at least Simpson was under treatment for them by doctors for various psychological disorders, including what he claims to be 'Asperger's syndrome,' both before and after they filed yet another false police complaint against Plaintiff which is the fourth since 2009 and itself clearly indicative of an obsessive disorder).

96.   After the Legal Aid Defendants threatened on March 25th, 2014 (and beyond) to prevent Plaintiff from testifying at his grand jury hearing by claiming Plaintiff was

psychologically incompetent to make legal decisions on his case, Plaintiff consistently consented to participate in the mental competency hearing requested by the Legal Aid Defendants with the requirement that once he is found competent to participate in his own defense that he be immediately allowed to terminate the Legal Aid Defendants from any further involvement with the case for even demanding such an evaluation.

**97.** The Legal Aid Defendants knew, or should have known at that time, that a psychiatric evaluation of Plaintiff could never result in his being found mentally incompetent to stand trial.  Repulsion to feces, which homosexuals describe using a 'clinical' term called 'homophobia,' is not an alleged 'illness' and has never before been acknowledged as such in the DSM-IV or DSM-V (the technical manuals describing psychological disorders), thus it is not possible that any psychologist can determine that Plaintiff suffers from a psychological disorder because he is repulsed by feces.  Plaintiff thereby offered to undergo a <u>video-taped</u> psychological evaluation to prevent further misconduct on the case by biased psychologists that were apparently 'waiting in the wings' to be recruited by Legal Aid.  Once Plaintiff requested this stipulation that the psych evaluation must be video-taped to prevent any potential abuse, Legal Aid Defendants retreated from their position after several weeks of pushing it and never brought it up again (but still refused to provide exculpatory evidence to the prosecutors).

**98.** When the Legal Aid Defendants thereby notified the Prosecution Defendants that they were not successful in threatening Plaintiff to waive his right to testify at the grand jury on March 25th, 2014 (which was the day the Prosecution Defendants were claiming to file notice with the Criminal Court of intent to proceed to the grand jury), the Prosecution Defendants

thereby retreated and failed to file notice for a grand jury hearing on that day as they previously stated that they intended to do.

99.     Plaintiff also terminated Defendant Dell and the Legal Aid Defendants as his attorneys on several occasions both before and after the March 25th, 2014 meeting at the Legal Aid Office, such terminations occurring because Legal Aid Defendants refused to subpoena evidence and/or respond to Plaintiff's calls/emails and additionally accuse Plaintiff of suffering from a psychological disorder because he is repulsed by feces, and also for refusing to disclose exculpatory evidence to the Prosecution Defendants to prevent upgrade of the charges to a felony.  Every time Plaintiff neared an upcoming Court date where he intended to confirm his termination of the Legal Aid Defendants to the Court, Defendant Dell would then start to send out subpoenas (albeit deliberately flawed) and pretend as though he was working on the case to convince Plaintiff not to terminate him.  After the Court dates, Defendant Dell would thereby collapse back into intransigence and refuse to do any work or return any calls or correct any of his errors, and this pattern continued for 7 months before being terminated in April of 2014.  Even after being terminated in April of 2014, Defendant Dell still refused to accept the termination and attempted to forcibly continue as Plaintiff's attorney by refusing to immediately notify the Court as requested by Plaintiff, leading to addition conflict and contentious engagements until he finally withdrew on April 21st, 2014.

100.     The final act of sabotage by Defendant Dell concerns his refusal to serve a subpoena upon Verizon for a final trace of the April 7th, 2013 email, and subsequent refusal to forward the subpoena response from Verizon for that communication to Plaintiff Pro Se after receiving it just days after he withdrew as Plaintiff's attorney.  This incident occurred as follows:

41

After Plaintiff contacted Verizon in April of 2014 and confirmed that Defendant Dell still refused to send them a subpoena, Plaintiff printed out a copies of the subpoenas and faxed/emailed them directly to the ISP.  Defendant Dell thereby became upset that Plaintiff was 'forcing' him to subpoena this material that was all of a sudden 'not relevant,' and he then ran to the Court to withdraw as Plaintiff's attorney on April 21st, 2014 by alleging to the Court that there was a 'conflict of interest' in order to again attempt to invalidate his own subpoenas which he was refusing to himself issue to the ISPs directly.

**101.**  Even after Defendant Dell withdrew and fled the scene of his crimes in April of 2014, Verizon still responded to the April 2014 subpoena Plaintiff faxed to them in Defendant Dell's name, and they did this on May 1st, 2014 as documented in Appendix EX200.  When Defendant Dell received this response from them (with a copy also provided to the Court by Verizon which was how Plaintiff finally obtained it just this past November of 2015), Defendant Dell thereby withheld this May 1st subpoena response from the Legal Aid file he transferred to Plaintiff on the next Court Date on May 12th, 2014.  Defendant Dell thereby deliberately sabotaged Plaintiff's defense even after withdrawing from the case by deliberately withholding the most critical piece of exculpatory evidence in Plaintiff's entire defense, which was the final trace of the April 7th threat that incited his following response for which he was illegally arrested.

## THE NY CRIMINAL COURT DEFENDANTS

**102.**   After Plaintiff terminated Defendant Dell as his attorney in April of 2014, he thereby began to communicate directly with NYC Criminal Court Attorney Edward Kerins and the Criminal Court Clerks requesting access to his Court file so that he could start to mount a defense to the allegations.  When Plaintiff dismissed Legal Aid and applied to the Criminal Court Judge to defend himself starting in May of 2014, the court file already contained numerous subpoena responses from various ISPs thereby documenting the source of the cyber-stalking campaign engaged against Plaintiff (including a May 1st, 2014 Verizon trace of the IP address specifically used to send the April 7th email threat that incited Plaintiff).  Starting on May 12th, 2014, Defendant Edward Kerins thereby additionally began to specifically obstruct Plaintiff's ability to access the Court file by refusing to provide Plaintiff a copy of all subpoena responses contained in the file so that he could thereby mount his defense.

**103.**   A specific example of this obstruction is fully documented as follows:  After Plaintiff contacted Verizon and confirmed that they also sent their subpoena responses directly to the NY Criminal Court, he thereby attempted to obtain a copy of the response from Defendant Kerins as was his legal right, and as all prior attorneys on the case were also allowed full access to the Court file any time they request.  On 7/29/2014, Plaintiff spoke to an employee of the NY Criminal Court named "Mrs. Casey" who specifically informed Plaintiff that Defendant Kerins directly picked up and received from them (the Part A Office) on 7/22/2014, the subpoena responses from Verizon contained at EX200 and a still unknown second ISP subpoena response.

**104.**   After obtaining confirmation from Mrs Casey that Defendant Kerins specifically picked up and was in direct possession of the Verizon subpoena response relevant to Plaintiff's

criminal case (and she specifically indicated and remembered that the subpoena was from Verizon in this documented conversation), Plaintiff contacted Defendant Kerins on both 7/28/2015 (call to 646-386-4713, duration 2:00 minutes) and 7/29/2015 (call to 646-386-4713, duration 1:15 minutes) and requested a copy of the subpoena response so that he could file it in a motion to dismiss the case. In both conversations, Defendant Kerins denies receiving the Verizon subpoena response while not knowing that just a short while earlier, Mrs. Casey from the Part A Office had already informed Plaintiff in recorded conversation that Defendant Kerins picked up the very documents that he was now denying knowledge of their existence in subsequent recorded conversations with Plaintiff.

105. The continued withholding of this evidence by Defendant Kerins thereby prevented Plaintiff from being able to file a motion to dismiss the case starting since at least 7/22/2015 when Plaintiff confirmed that the relevant Court personnel were already in possession of the main exculpatory evidence in the case. The withholding of this evidence continued even past the recorded conversations on 7/28 and 7/29 of 2014 for months and months, as despite Defendant Kerins pledge to release this evidence to Plaintiff as soon as he obtains it, he simply refuses to respond and refuses to release the evidence to Plaintiff.

106. The obstruction of access to the Court file by Edward Kerins started approximately May of 2014 and continued even after 7/22/2015 when he received the Verizon exculpatory materials which he unlawfully withheld, and then even until the case was dismissed in February of 2015. This obstruction thereby completely prevented Plaintiff from being able to file a proper motion to dismiss the criminal complaint early on in the case. At the same time this obstruction by Defendant Kerins was occurring, Plaintiff was being dragged to the NY Criminal Court for

almost another year without anything significant occurring on the case whatsoever other than constant extensions of time being granted to the prosecutors to 'investigate.'

107.   Once the case was dismissed, jurisdiction over the Court File then fell solely under the discretion of the Clerk's Office wherein these records are now specifically governed by N.Y. CPL. LAW § 160.50 : NY Code - Section 160.50 (Order upon termination of criminal action in favor of the accused).   CPL § 160.50 states the following:

> "Upon the termination of a criminal action or proceeding against a person in favor of such person, as defined in subdivision three of this section, unless the district attorney upon motion with not less than five days' notice to such person or his or her attorney demonstrates to the satisfaction of the court that the interests of justice require otherwise, or the court on its own motion with not less than five days' notice to such person or his or her attorney determines that the interests of justice require otherwise and states the reasons for such determination on the record, the record of such action or proceeding shall be sealed and the clerk of the court wherein such criminal action or proceeding was terminated shall immediately notify the commissioner of the division of criminal justice services and the heads of all appropriate police departments and other law enforcement agencies that the action has been terminated in favor of the accused, and unless the court has directed otherwise, that the record of such action or proceeding shall be sealed"

108.   Once the criminal case was dismissed by the Manhattan DA, the Court File was thereby sealed.   Regardless of this fact, CPL § 160.50(1)(d) specifically states "(d) such records shall be made available to the person accused or to such person's designated agent."   After Defendant Kerins refused to respond to provide Plaintiff a copy of the file, Plaintiff thereby contacted the Clerk directly to demand a copy of the file pursuant to CPL § 160.50(1)(d).   Since there was already a civil case against Defendants Simpson/Albro ongoing in the Southern District of Florida (also eventually dismissed for lack of jurisdiction), Plaintiff thereby obtained a subpoena for the file through the Florida Court Case because he anticipated that the Criminal Court (via the prior unlawful obstruction of access to the file by Defendant Kerins), was already

engaged in the criminal conspiracy orchestrated by the Defendants to block Plaintiff from any and all access to the exculpatory evidence which was now accumulating in the court file. Plaintiff has a legal right of access to his own court file, especially as the exonerated criminal defendant under CPL § 160.50(1)(d).

**109.** After Plaintiff sent the Clerk's Office a letter and subpoena requesting the file, an unidentified Clerk called Plaintiff to inform him that he did not need to send a subpoena but that he should instead send a notarized letter requesting the file. Plaintiff thereby sent them this notarized letter (D.E. 37-1, Page 1) on May 2nd, 2015. The Clerk thereby responded to this letter with a small portion of the file containing just the orders of protection (for which Plaintiff already had copies). At that time, the Court withheld all the subpoena responses from numerous ISPs, all the filings made by the Manhattan DA and Legal Aid Defendants, all letters/motions filed with the court, all criminal abstracts, etc. Plaintiff thereby again reached out to the Clerk after this inadequate response and spoke directly to a supervising clerk, Defendant Miguel (First Name Unknown). At that time, Defendant Miguel stated that she could not discuss what the file contained over the phone because the law prohibits it, and thus she was unable to use the phone to discuss with Plaintiff why documents were withheld. Plaintiff thereby informed Defendant Miguel that he would travel to the Court directly to further discuss it.

**110.** Plaintiff thereby travelled to the NY Criminal Court on October 15th, 2015 to once again retrieve his file. After providing the Clerk Defendant Jane Doe 10 with the appropriate documentation confirming Plaintiff's identity, Jane Doe 10 again refused to release anything significant in the file and had merely reissued the orders of protection and a time-stamped first page copy of the motions filed by Plaintiff. After arguing with Defendant Jane Doe 10 for some

time, she again went back to the file and release just one Verizon subpoena response dated December 11th, 2014, concerning other IP addresses linked to blogs operated by the Defendants (which is also documented in Appendix at EX200).  Jane Doe 10 thereby refused to release any further documents from the file unless Plaintiff returned the next day and spoke to Defendant Miguel and/or a supervisor).

**111.**  Plaintiff returned the next day to the NY Criminal Court on October 16th, 2015, and again asked to speak to Defendant Miguel and/or a supervisor, and they claimed she was not there and they refused to assist him any further.  Plaintiff was thereby forced to return to Florida and again spoke to Defendant Miguel over the phone to inform her that even when Plaintiff travelled to the clerk's office directly, he was still denied access to his file.  Defendant Miguel informed Plaintiff to again send yet a second notarized letter requesting the file, claiming that upon receipt of this letter she would comply.  Plaintiff then sent Defendant Miguel another notarized letter on October 23rd, 2015 requesting access to the file (filed as D.E. 47-1).  After two weeks, she again responded via mail by only providing a dozen pages of documents while continuing to withhold the entire remainder of the file comprised of hundreds of pages.

**112.**  In this last response, Mrs. Miguel again sent irrelevant criminal abstract materials, and this time she finally did send the Verizon subpoena response dated May 1st and July 11th, 2014 (EX200) confirming that the origin of the April 7th, 2015 threat did indeed originate from the residence shared by Defendants Simpson/Albro, yet she still withheld all the other subpoena responses from Amazon, Google, Yahoo, Proxy Solutions LLC, Various Networks, PayPal and all other corporations which were issued subpoenas through the criminal case.  Defendant Miguel additionally withheld all motions, letters, documents filed by the Manhattan DA office

(which are confirmed to have been filed via the transcripts of the hearings), and she further refused to disclose to Plaintiff exactly which documents were being withheld, and why (as requested in his notarized letter). Defendant Miguel also withheld the supporting affidavit for the May 1st, 2014 Verizon subpoena response because this supporting affidavit also confirms that it was addressed to Legal Aid and thus it confirms that Legal Aid also received a copy at that time (prior to the second identical response sent by Verizon to the Court in July which was not addressed to Legal Aid). Thus Defendant Miguel is also demonstrating knowledge of what exactly is relevant to withhold based upon her clear understanding of what documents Plaintiff needs to support his claims, and this indicates clear collusion with Defendant Edward Kerins who is intimately familiar with the case, along with the remaining defendants.

**113.** The evidence contained in the court file was thus deliberately and unlawfully withheld by Defendant Kerins of the NY Criminal Court from May of 2014 until February of 2015 until he passed the torch to Defendants Miguel and Jane Doe 10 to continue their obstruction of Plaintiffs access to his own court file continuing to present, including unlawful obstruction of access to the very evidence which exonerated Plaintiff of the false charges to begin with. Plaintiff has made numerous attempts, both via correspondence, telephone and in person (despite residing in Florida) attempting to retrieve the file and all have failed. Plaintiff has thereby exhausted all administrative remedies to confirm that the NY Criminal Court is illegally withholding the file to also assist the pro-gay defendants in violation of NY CPL § 160.50(1)(d), and to punish the Plaintiff for refusing to join the homosexual religion in complete violation of his civil rights.

**Terrorism implications of the Section 1983 conspiracy described in this Complaint**

**114.** Simpson/Albro are party to a settlement contract reached in Delaware in Case No. 10-431-RGA (the "2012 Contract") which was reached between the Plaintiff and the King of Morocco via his registered foreign agent Ambassador Edward M. Gabriel. The 2012 Contract is filed with 3rd Circuit in Appeal No. 14-2663 on 1/06/2015 and can be downloaded on PACER at: https://ecf.ca3.uscourts.gov/docs1/00311183896996

**115.** Paragraph 25 of the 2012 Contract clearly states:

"The School, The Named Defendants and/or any of the Releasees expressly agree that a breach of any of the promises and covenants made by them in this Agreement, including the filing of a lawsuit *or a criminal complaint* against Mr. Kabbaj, ***shall be considered a material breach of the terms of this Agreement***, and shall entitle Mr. Kabbaj to all remedies available at law, including, but not limited to, costs and reasonable attorneys' fees incurred in enforcing this Agreement, unless otherwise specifically prohibited by statute or regulation."(Emph. Added)

**116.** Mark Simpson is defined as a Named Defendant in the 2012 Contract, and thus the filing of a criminal complaint against Plaintiff is a material breach of Paragraph 25 (and other provisions) of the 2012 Contract for whom Ambassador Gabriel was the guarantor. All Defendants were aware of this contract by learning about it either from AST, the Plaintiff and/or Simpson/Albro directly, and thus they are aware that Defendant Simpson is already barred from filing any civil/police complaints against Plaintiff without first obtaining permission from the Delaware Court.

**117.** Plaintiff's involuntary status as a terrorism mediator is described in MOTION TO RECUSE JUDGE ROSS filed in the 3rd Circuit in Appeal No. 14-2663 on 3/9/2015 as follows:

MOTION RECUSE JUDGE ROSS      https://ecf.ca3.uscourts.gov/docs1/003111898699
Motion Recuse Judge Ross Exhibits 01-13  https://ecf.ca3.uscourts.gov/docs1/003111898701
Motion Recuse Judge Ross Exhibits 14-34  https://ecf.ca3.uscourts.gov/docs1/003111898702

118. When the Defendants Simpson/Albro falsely accused Plaintiff of breaching a 2012 Contract with the King of Morocco (who is a distant relative of Plaintiff), this action is also intended by them to deliberately provoke violence between Shitte and Sunni Islamic authorities in the Middle East which is consequently intended to provoke violent terrorism all over the globe. Plaintiff fully articulated these concerns to Simpson/Albro and other Defendants starting since <u>at least</u> 2009 in Morocco, yet Defendants Simpson/Albro decided that they did not care and that their 'gay rights' allow them to fabricate lies to cause conflict between military figures in Morocco, no matter what the consequences are to persons who are thereby affected by this illegally provoked violence between the parties.

119. The actions of the Defendants Simpson/Albro (and the remaining Defendants to join their conspiracy) are thereby calculated by them to thrust Plaintiff into a conflict with Sunni Islamic Authorities that will require him to make an alliance with Shiite Islamic Authorities whereby such an alliance (which will include the transfer of top-secret information) is generally harmless to the Sunni Authorities but can instead harm countries like Israel (because Plaintiff is also a biological Jew) and consequently America/Britain/France. As such, Plaintiff understands that these specific crimes being engaged against him by the Defendants are not only seeking to provoke terrorism specifically against Arabs and Muslims, but are also hoping to provoke terrorism against essentially <u>everyone</u> if they fail at their attempt to 'wipe out' all Muslims.

120. The Defendants represent a homosexual religious perspective which is especially biased against Plaintiff's religious disposition as a follower of Judaism and Islam, because the source text of those two religions have mathematically-based prohibitions against homosexuality (ie the ELS code in the first five books of Moses, and the Muqatta'at in the Quran), whereas

Christianity only has a spiritually-based prohibition against homosexuality.  Defendant Simpson also publishes numerous articles claiming to be conducting all his activities against Plaintiff under his Episcopalian Christian understanding of the world and that he is thus also biased against Plaintiff for being an adherent of the Catholic religion because it represents an 'invalid' version of Christianity in his eyes.  Defendant Simpson's publications clearly show just as much animosity against Catholicism as they do against Islam, thus these admissions are proof of bias against Plaintiff's three religions of Judaism/Christianity/Islam (albeit for different reasons).

121.   By tortuously interfering with the 2012 Contract, the Defendants are thereby attempting to force Plaintiff to re-align his allegiances in the Middle East in a manner that also affects how he will ultimately extract himself from any further terrorism mediations in light of the deliberate continued sabotage being engaged against him by the Defendants and their constituency (going all the way back to 1987).  This will result in the abandonment of the cease fire which Plaintiff negotiated following the 911 attacks concerning specific types of spectacular attacks, as is documented by Plaintiff in Case No. 11-23492-MGC (SDFL) and additional pleadings referenced in this Complaint.

122.   Plaintiff has thereby executed his obligation to fully inform all litigants and the Court regarding the unprecedented ramifications of this particular dispute and how it is specifically shaping events directly related to violence terrorism, including the most recent Paris terrorist attacks (as documented by Plaintiff in D.E 35, 38, 48, 50 of this instant case).

## CAUSES OF ACTION

**123.**   Each Defendants acts/omissions as they relate to the causes of action are documented via Paragraph number as listed in the Table of Contents for this complaint (Page 1).

### FIRST CLAIM – Declaratory and Injunctive Relief - All Defendants

**124.**   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

**125.**   Plaintiff is requesting the Court declare that the arrest, injury, torture and malicious prosecution of Plaintiff was unlawful.   Plaintiff is requesting that all records, pictures, documents, properties, digital materials (including USB key provided to Defendant Egan), retinal scans, DNA, etc still in the possession of any Defendant, be returned to Plaintiff immediately. Plaintiff is also requesting an ORDER issue to the NY Criminal Court Defendants instructing them to immediately comply with NY CPL 160.50 and provide Plaintiff with a full and complete copy of his Court file.

### SECOND CLAIM – Tortious Interference – All Defendants

**126.**   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

**127.**   After becoming involved with the investigation into Simpson/Albro and the illegal arrest and malicious prosecution of Plaintiff, all Defendants were informed of the existence of the 2012 Contract to which Simpson was a party, and which is executed between Plaintiff and the King of Morocco through a main intermediary Ambassador Gabriel.

**128.**   Acts/Omissions described in this Complaint thereby tortuously interfered with the 2012 Contract by sustaining a false arrest/malicious prosecution of Plaintiff to provoke further

breaches of the Contract thereby engaged by Plaintiff, to a point where nearly all provisions of the contract are now violated by all parties indefinitely, resulting in damages to Plaintiff far exceeding those documented in the complaint, as the breach of the contract now prevents Plaintiff from being able to return to employment since 2011 because he has not yet been able to restrain the false and defamatory publications accusing him of hacking and terrorism, and this is now further compounded by a false arrest for which all parties are obstructing Plaintiff's access to the exculpatory evidence proving his innocence so that the defendants can thereby attempt to claim that the criminal case against Plaintiff was dismissed for any and all other reasons other than the Defendant's criminal complaint having been falsely filed.  The offense conduct relevant to this claim are thereby documented with regards to each Defendant as described in the Table of Contents on Page 1 of this Complaint.  The above-named Defendants' acts and omissions are a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff.    Plaintiff is requesting damages for this claim to be determined by jury.

## THIRD CLAIM – Negligence - All Defendants

**129.**  Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

**130.**  Defendants were at the very least, negligent in refusing to investigate and/or arrest Simpson/Albro for their continued threats against Plaintiff from 2009 to present, and for engaging actions/omissions which provided Simpson/Albro protection to engage another false arrest and malicious prosecution of Plaintiff from September 2013 until February 2015, and for engaging acts/omissions which have continued to prevented Plaintiff from access to his court file and all exculpatory evidence used to justify dismissal of the claims.

**131.** Acts/Omissions described in this Complaint which are deemed negligent are thereby documented for each Defendant as described in the Table of Contents on Page 1 of this Complaint. The above-named Defendants' acts and omissions are a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff for which he is requesting damages to be determined by jury.

**FOURTH CLAIM – Negligent/Intentional Infliction of Emotional Distress – All Defendants**

**132.** Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

**133.** Plaintiff hereby asserts that the Defendants would also be culpable for Negligent and/or Intentional Infliction of Emotional Distress with regards to their actions, as defined for each Defendant according to Paragraph 109. Their actions/omissions, which are in the very least negligent (if not outright intentional), are also responsible for causing Plaintiff emotional distress resulting from his false arrest, illegal imprisonment and injury while in police custody (including a minimum of two months of extreme pain and even a surgery resulting from injury). Plaintiff was also subjected to substantial discomfort and distress by being forced to maintain nearly monthly travel and lodging in New York (1300 miles from his home in Florida) to keep up Court appearances so that a warrant for his arrest is not issued, all of which occurred because the defendants were able to prolong the malicious prosecution with their acts/omissions.

**134.** Acts/Omissions described in this Complaint which are deemed to have negligently and/or intentionally inflicted emotional distress upon Plaintiff are thereby documented for each Defendant as described in the Table of Contents on Page 1 of this Complaint. The above-named

Defendants' acts and omissions are direct and proximate cause of the injuries, damages and harm

suffered by Plaintiff. Plaintiff is requesting damages for this claim to be determined by jury.

**FIFTH CLAIM – False Imprisonment - Defendants FBI, DHS, NYPD, Egan, John Doe 1-4, Kennerson, McClenic**

**135.** Plaintiff incorporates by reference the allegations set forth in the preceding

paragraphs of the Complaint as though set forth at length herein.

**136.** Plaintiff is requesting this Court impose damages against Defendants FBI, DHS,

NYPD, Egan, John Does 1-4, Kennerson and McClenic for illegally conspiring to lure Plaintiff

from Florida to New York to be subjected to a false imprisonment. Defendants

Kennerson/McClenic were aware that Simpson/Albro were stalking Plaintiff since 2011, and

were aware that Simpson/Albro sent death threats to Plaintiff starting since Morocco and

continuing until April 7th, 2013 and beyond, and Kennerson/McClenic also became aware that

Defendants NYPD, Egan, John Does 1-4 were thereby plotting to falsely arrest Plaintiff on

September 26th, 2013, but they refused to intervene to prevent the imminent false arrest.

**137.** Defendants NYPD, Egan thereby succeeded in luring Plaintiff to New York on

September 26th, 2013 for what they knew was a false arrest and illegal imprisonment of Plaintiff

without legal cause to also be engaged with assistance from John Does 1-4. Defendants

Kennerson/McClenic were aware this imminent illegal action but refused to prevent it.

**138.** Acts/Omissions relevant to this false imprisonment engaged upon Plaintiff from

September 26th, 2013 until September 27th, 2013 (for approximately 30 hours) are documented

for each Defendant as described in the Table of Contents on Page 1 of this Complaint. The

above-named Defendants' acts and omissions are direct/proximate cause of the injuries, damages

and harm suffered by Plaintiff including severe injury and substantial pain for months with surgery to correct the condition.  Plaintiff is requesting damages to be determined by jury.

### SIXTH CLAIM – Malicious Prosecution – All Defendants except Miguel, John Does 3-4, Jane Doe 10

**139.**   Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

**140.**   Plaintiff hereby asserts that all Defendants (except John Does 3-4) would also be culpable for Malicious Prosecution.  Their actions/omissions as described for each defendant in Paragraph ##, are in the very least negligent (if not outright intentional) while also responsible for causing Plaintiff to be subjected to a malicious prosecution starting from at least September 26th, 2013 and extending until at least February 9th, 2015, which also required Plaintiff to maintain nearly monthly travel and lodging in New York (1300 miles from his home in Florida) to keep up Court appearances so that a warrant for his arrest is not issued.  Any individual defendant could have terminated the malicious prosecution at any time by engaging investigative job duties to confirm the facts of this dispute, but all made the decision to act in concert with each other to obstruct investigation and thereby negligently or intentionally allow the malicious prosecution to continue until February 9th, 2015.

**141.**   Acts/Omissions relevant to how each Defendant assisted to institute and prolong the malicious prosecution for over a year and six months, are documented for each Defendant as described in the Table of Contents on Page 1 of this Complaint.  The above-named Defendants' acts and omissions a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff during the malicious prosecution, including expenses in conducting a defense, keeping

up appearances in New York, and stress related to constant threat of incarceration for long periods of time. Plaintiff is requesting damages for this claim to be determined by jury.

### SEVENTH CLAIM - Violation of 42 USC §1983, Conspiracy against Civil Rights – All Defendants

**142.** The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall deny to any person within its jurisdiction "the equal protection of the laws." In this matter, the Defendants assisted Simpson/Albro and their homosexual religious constituency to commit crimes against the Plaintiff simply because they all share the same religion (ie a belief in the homosexual religion), which is opposed in principle by the Plaintiff's belief in the traditional Judaic/Christian/Islamic religions. Simpson admits in numerous blog postings that he is engaging this illegal activity against Plaintiff based upon bias against Muslims and Catholics, and the Defendants are aware of these blog postings yet still choose to assist Defendant Simpson with his criminal plots.

**143.** The Defendants thereby violated Plaintiff's civil rights to punish him for his race (ie biological Arab/Jew), national origin (from Morocco) and his religion (ie Abrahamic Jewish/Christian/Muslim). Because Plaintiff was born into the Judaic/Islamic religion, his race/religion is thereby offensive to the Defendants because Judaism/Islam is opposed to homosexuality. Because homosexuality and pornography are illegal in Morocco and Plaintiff is of Moroccan descent, his national origin is thus also offensive to the Defendants. Because Plaintiff is also an adherent of Catholicism, his religious beliefs under Christianity are also offensive to the Defendants because homosexuality is considered a disorder/sin in the Catholic religion and Defendant Simpson purports that the Episcopalian faith is 'superior' to all other forms of Christianity. For those reasons, the Defendants thereby meticulously and maliciously

57

plotted to subject Plaintiff to a false felony conviction and potential ten year sentence for a 'hate crime' simply because Plaintiff belongs to a race, national origin and Abrahamic religious structure that is itself offensive to the Defendants (without any other provocation by Plaintiff).

**144.** The Defendants violated Plaintiff's civil rights when they all illegally conspired to arrest and prosecute Plaintiff numerous times starting since 2009 in Morocco. In 2013, Plaintiff was again arrested for engaging speech which is protected under the First Amendment as per Plaintiff's right to respond to criminal threats in any manner necessary to deter further threats from the illegal aggressors (especially after refusal by Federal authorities to restrain the Defendants thereby automatically allows Plaintiff to defend himself as he deems necessary). It is not legal for Simpson/Albro to send unsolicited illegal death threats to Plaintiff (that State/Federal law enforcement thereby refuse to prosecute simply because Simpson/Albro are homosexual), while at the same time these Defendants arrest and vigorously prosecute Plaintiff for using appropriately aggressive speech (not physical acts of violence) to defend against this most recent manifestation of this long-term dispute. By even filing litigation, it is clear that Plaintiff is absolutely trying his hardest to keep from being forced into using more defensive violence such as what had occurred with Joseph McPhillips (the friend of the Defendants who stalked Plaintiff from 1987 to 2007 before being assassinated).

**145.** The actions of the Defendants are a violation of the equal protections clause of the constitution because homosexuals are not allowed to be given preferential treatment under the law simply because they are homosexual, nor are religious persons supposed to be treated more harshly by the law simply because they chose to join the Jewish/Christian/Islamic religion as opposed to choosing to join the homosexual religion. Additionally, First Amendment rights

cannot be applied differently to homosexuals (or adherents of the homosexual religion) than they would be applied to heterosexuals (or adherents of the Abrahamic religions). Thus Plaintiff is subjected to a double-violation of his rights as follows: It is a violation of Plaintiff's rights for the Defendants to refuse to arrest/prosecute Simpson/Albro for their emails to Plaintiff threatening him and his mother when they are clearly a crime (as demonstrated by Defendant Simpson/Albro's attempts to use specialized anonymity technology to hide their source). It is additionally a violation of Plaintiff's civil rights for the defendants to arrest, physically abuse and then maliciously prosecute him solely because he adheres to the Jewish/Christian/Muslim religions which deem the threatening actions of the Defendants to be a crime and not some 'passive harmless homosexual religious expression of identity' as is being claimed by the Defendants under some delusional banner of personal religious beliefs that make it 'legal' for homosexuals to threaten and stalk non-homosexuals.

**146.** Since all Defendants knew that Simpson/Albro incited Plaintiff with illegal death threats to provoke his response, it is thereby clear to all Defendants that Plaintiff could not formulate criminal intent by responding to Simpson/Albro to deter these crimes and thus Plaintiff's speech is protected under the First Amendment as defensive speech engaged to neutralize verbally offensive and threatening speech directed against him by the Defendants. As such, it is thus clear that the arrest and malicious prosecution of Plaintiff was just as illegal as the refusal to arrest Simpson/Albro for engaging actual harassment and stalking of Plaintiff to begin with (which the police instead acted to protect from prosecution), even as the threats continued while the criminal prosecution of Plaintiff was still pending.

147.   The physical torture of Plaintiff while in police custody by denying him access to toilet paper to use bathroom is also a malicious consequence of the race/national origin/religious bias, as when Plaintiff informed Defendant Egan that repulsion to feces can prevent attraction to anal sex (for homosexuals who develop this fetish as per their religious beliefs), Defendant Egan thereby sought to deprive Plaintiff of toilet paper to use the bathroom as some sort of joke between him and his friends.  This was done in an effort to punish Plaintiff for his repulsion to feces by essentially attempting to force him into contact with his own feces by directing him to use his clothes or his hands to clean himself after using the bathroom.  Defendant Egan engaged this torture against Plaintiff for no other reason than Plaintiff having expressed that repulsion to feces is healthy.  Defendant Egan belongs to a homosexual religion that states it important for humans to become desensitized to feces in order to enjoy the full spectrum of human interactions (especially as part of the erotic expressions), and thus Defendant Egan sought to forcibly 'baptize' Plaintiff into his religion by attempting to force Plaintiff into contact with his own feces as part of a covert sexual molestation of Plaintiff.  Defendant Egan thereby sought to punish Plaintiff for having a natural repulsion to feces because it conflicts with his belief that all people should overcome 'homophobic' repulsion to feces in order to be considered 'normal.'

148.   By targeting Plaintiff after becoming aware of his sensitive role as a terrorism mediator, the Defendants also knowingly sought to forcibly sabotage Plaintiff's terrorism mediation activities as part of an attempt to provoke a massive terrorist attack, larger than the one which occurred on 911 (if they could use it as a distractive tool to cover up their crimes). The Defendants are hoping that if they can provoke a large enough terrorist attack, that their constituency in the Federal government will then swoop in and arrest the Plaintiff to completely

restrict his ability to communicate about these crimes so that they may later attempt to classify the entirety of this 'investigation' top-secret to successfully conceal their criminal conspiracy from the public. This conspiracy originates with high-ranking Hollywood officials who have been pursuing a 'reality television' project by seeking to provoke actual terrorist attacks like 911 as a means to use intentionally deceptive media coverage of such attacks to obtain a religious 'advantage' for the homosexual religion. This plot to manufacture violence between Jews/Christians/Muslims as a means by which to diminish the allure of the Abrahamic religions (as documented in the MOTION RECUSE ROSS and the body of litigation related to this dispute), is pure evil.

**149.** Plaintiff hereby asserts that all Defendants are thereby be culpable for engaging acts/omissions in support an overarching conspiracy to violate Plaintiff's civil rights via physical violence, false arrests, malicious prosecutions and deliberate obstruction of investigations, which are anticipated to continue indefinitely. The malicious prosecutions have been ongoing since 1987 when an attempted molestation of Plaintiff by Defendant Simpson's friend, Joseph McPhillips, was first attempted, and the Defendants have already conducted at least 6 malicious prosecutions of Plaintiff since 1996 as documented in MOTION RECUSE ROSS (only one of which resulted in a false federal conviction of Plaintiff on a Pakistani heroin charge linked directly to the Al-Qaeda organization). Acts/Omissions relevant to this most recent malicious prosecution are documented for each Defendant as described in the Table of Contents on Page 1 of this Complaint. The Defendants' acts and omissions in support of the most recent false arrest/malicious prosecution are a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff who is requesting damages for this claim to be determined by jury.

**EIGHT CLAIM – Violation of Federal Tort Claims Act, 28 U.S.C. § 2674, § 1346(b) et seq.
Defendants FBI, DHS, USMS, Kennerson, McClenic, Kennedy, Wakowski, John Does 8-9**

    **150.** At all times relevant to the complaint, Defendants FBI, DHS, USMS, Kennerson, McClenic, Kennedy and Wakowski are the Federal Defendants responsible for obstructing this investigation on a Federal level. As such, the Defendants can only be held liable for the torts of Tortious Interference, Negligence, Negligent/Intentional Infliction of Emotional Distress, False Imprisonment and Malicious Prosecution through the FEDERAL TORT CLAIMS ACT. The Federal Defendants all acted within the scope of their employment through their own actions/omission as described in the torts claims listed as Claim Two, Three, Four, Five, Six and Seven of this complaint, and as described in the Table of Contents on Page 1 of this Complaint. Their acts/omissions are such that would render Defendants FBI, DHS, USMS, Kennerson, McClenic, Kennedy, Wakowski, John Doe 8-9, if a private person, liable for the damages resulting from their actions under all applicable State/Federal laws. Defendants FBI, DHS, USMS, Kennerson, McClenic, Kennedy, Wakowski and John Does 8-9 are therefore liable to Plaintiff pursuant to 28 U.S.C 1346(b) and 2674 for the State torts described in this Complaint under claim Two, Three, Four, Five, Six and Seven.

    **151.** Plaintiff presented the United States with notification of the unlawful conspiracy described in this complaint, along with a claim for monetary damages which was sent to each of these agencies using Standard Form 95 on or about September 26th 2011 (approximately two months after being approached by Defendants FBI/DHS/Kennerson/McClenic who were claiming to investigate these matters). The submission of the Standard Form 95 was followed by ongoing litigation against Defendants FBI/DHS/NYPD since September 26th, 2013 starting with Case No. 11-23492-MGC (Southern District Florida), all of which did nothing to deter the

Federal Defendants from increasing their crimes against the Plaintiff to include yet another false arrest, unlawful imprisonment and malicious prosecution taking place from September 26th, 2013 until February 9th, 2015 while litigation against them was still pending in the Southern District of Florida and 11th Circuit Court of Appeals.

**152.** Defendants FBI, DHS, USMS, Kennerson, McClenic, Kennedy, Wakowski, John Does 8-9, through their actions and omissions as described in the complaint, are thereby liable to Plaintiff for such State torts listed as Tortious Interference, Negligence, Negligent/Intentional Infliction Emotional Distress, Unlawful Imprisonment and Malicious Prosecution via the FEDERAL TORT CLAIMS ACT. Acts/Omissions relevant to this claim are documented for each Defendant as described in the Table of Contents on Page 1 of this Complaint. The Defendants' acts/omissions in support of these torts are a direct/proximate cause of injuries, damages, harm suffered by Plaintiff who is requesting damages be determined by jury.

## PRAYER FOR RELIEF

**153.** Plaintiff respectfully requests the court enter judgment awarding on the Second through Eighth claims for compensatory and punitive damages in an amount determined by jury. Granting such other and further relief as the Court deems just and proper, including legal expenses, investigative expenses, expert witness expenses, hospital and medical expenses, travel and lodging expenses, damages resulting from unemployment and other damages.

Respectfully submitted December 9th, 2015

/s/ Younes Kabbaj_____
Younes Kabbaj
Tel: (718)766-8128
Email: jonahkabbaj@gmail.com

## CERTIFICATE OF SERVICE

Plaintiff has served this FIRST AMENDED COMPLAINT upon the following defendants via ecf/email:

DEFENDANTS: Mark S. Simpson and Brian K. Albro

Marcos Daniel Jimenez     Marissa C. Krumm     Randolph Karl Herndon     David L. Finger
mjimenez@mwe.com   mkrumm@mwe.com   rherndon@mwe.com   dfinger@delawgroup.com

DEFENDANTS: New York County District Attorney, Cyrus Vance, Samuel Levy, Chikaelo Ibeabuchi

Cyrus R. Vance                Sam Levy                Chikaelo Ibeabuchi
vancec@dany.nyc.gov         levys@dany.nyc.gov         Ibeabuchic@dany.nyc.gov

DEFENDANTS: New York City, NY Criminal Court, Desmond Egan, Timothy Wall, John Does 1-5, Edward Kerins, Mrs. Miguel

Daniel Guillermo Saavedra     dsaavedr@law.nyc.gov
Jenny Sue-Ya Weng          jweng@law.nyc.gov

DEFENDANTS: Legal Aid Society, Benjamin Dell, Tara Collins, David Kapner

Deborah Beth Koplovitz - dk@rosenlivingston.com
Peter I Livingston - pil@rosenlivingston.com

DEFENDANTS: USA, Department of Homeland Security, Ryan Kennerson, Chris McClenic

Preet Bharara - preet.bharara@usdoj.gov

DEFENDANTS (related litigation): American School of Tangier, Board of Directors American                                 Edward M. Gabriel, Stephen E. Eastman

Larry R. Seegull - larry.seegull@jacksonlewis.com
Charles.Kresslein - Charles.Kresslein@jacksonlewis.com

Respectfully submitted on December 9th, 2015

/s/ Younes Kabbaj_____
Younes Kabbaj (Address withheld for security concerns)
Tel: (718) 766-8128, Email: jonahkabbaj@gmail.com